[No. G036522. Fourth Dist., Div. Three. Apr. 23, 2007.]

RAY FLADEBOE et al., Plaintiffs, Cross-defendants and Appellants, v. AMERICAN ISUZU MOTORS INC., Defendant, Cross-complainant and Respondent.

**COUNSEL**

David B. Dimitruk for Plaintiffs, Cross-defendants and Appellants.

The Mulcahy Law Firm, James M. Mulcahy and Rex T. Reeves for Defendant, Cross-complainant and Respondent.

**OPINION**

**FYBEL, J.—**

INTRODUCTION

This case forcefully demonstrates the wisdom and significance of the doctrine of implied findings. Under the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision. Securing a statement of decision is the first step in avoiding the doctrine of implied findings, but is not always enough: The appellant also must bring ambiguities and omissions in the factual findings of the statement of decision to the trial court's attention. If the appellant fails to do so, the reviewing court will infer the trial court made every implied factual finding necessary to uphold its decision, even on issues not addressed in the statement of decision. The question then becomes whether substantial evidence supports the implied factual findings.

The trial court in this case issued a minute order with findings following a bench trial on a declaratory relief cause of action brought by Ray Fladeboe (Fladeboe), Ray Fladeboe Lincoln-Mercury, Inc. (RFLM), and Fladeboe Automotive Group, Inc. (Fladeboe AG). Fladeboe, RFLM, and Fladeboe AG (collectively Plaintiffs) alleged American Isuzu Motors Inc. (Isuzu), unreasonably withheld consent to RFLM's request to transfer an Isuzu dealership. The trial court made no express factual findings on that issue; rather, the trial court found that none of the Plaintiffs had standing to assert claims against Isuzu arising out of its withholding consent to the request to transfer the dealership. The trial court also found that Plaintiffs had unclean hands and that RFLM suffered no damages arising out of a withdrawn request to transfer the Isuzu dealership to Fladeboe Volkswagen, Inc. (Fladeboe VW).

Plaintiffs did not request a formal statement of decision, object to the trial court's factual findings, or bring any ambiguities or omissions in those findings to the trial court's attention.

Following the bench trial, a jury awarded Isuzu damages on its cross-complaint against Fladeboe and Fladeboe AG. The trial court then awarded Isuzu restitution on its claim under Business and Professions Code section 17200. Fladeboe and Fladeboe AG requested a statement of decision on three specific issues related only to the section 17200 claim.

Under these circumstances, the doctrine of implied findings requires us to infer the trial court impliedly made every factual finding necessary to

conclude that Isuzu did not unreasonably withhold consent to RFLM's request to transfer the Isuzu dealership to Fladeboe AG. Isuzu's reasons for withholding consent were reasonable under Vehicle Code section 11713.3, subdivisions (d) and (e) and were supported by the substantial evidence presented during trial on Plaintiffs' declaratory relief cause of action.

In addition, we find no error in the jury's award of damages or the trial court's award of restitution on Isuzu's cross-complaint against Fladeboe and Fladeboe AG. Accordingly, we affirm the judgment.

FACTS

## I.  *RFLM Creates a Plan of Dissolution.*

Fladeboe was the sole shareholder and the president of RFLM. RFLM became an Isuzu dealer around 1980. At that time, RFLM already was a dealer for Lincoln-Mercury and Honda. In 1982, RFLM became a Volkswagen dealer.

On March 21, 1983, RFLM doing business as Ray Fladeboe Isuzu entered into a new dealer sales and service agreement (the Dealer Agreement) with Isuzu. The Dealer Agreement was effective until RFLM dissolved in March 2002. The Dealer Agreement permitted Isuzu to terminate the agreement if RFLM attempted to sell, transfer, or assign the Dealer Agreement, or the dealership assets, without Isuzu's prior consent, "which consent shall not be unreasonably withheld."

In September 2001, RFLM and Ford Motor Company (Ford) reached an agreement whereby Ford would purchase the Lincoln-Mercury dealership assets of RFLM for $10 million and RFLM would resign as a Lincoln-Mercury dealer. To avoid double taxation on the sale proceeds, Fladeboe had his attorneys and tax advisers create a plan allowing the sale proceeds to be paid directly to him as the sole shareholder of RFLM. For the plan to succeed, it was necessary for RFLM to dissolve as a corporation and distribute its Lincoln-Mercury dealership assets before Ford paid the $10 million. The transaction was structured so that before RFLM dissolved, Ford gave it a promissory note for $10 million payable after dissolution. Before dissolution, RFLM was to assign the note to Fladeboe personally, and, after RFLM's dissolution, Ford would pay the $10 million to Fladeboe personally as RFLM's assignee.

For Fladeboe to realize certain tax advantages, RFLM had to be dissolved and all of its assets sold or distributed before Ford made the $10 million payment. RFLM's assets consisted of (1) the Lincoln-Mercury dealership,

(2) the Honda dealership, (3) the Volkswagen dealership, and (4) the Isuzu dealership. RFLM adopted a plan of liquidation by which it would sell the Lincoln-Mercury dealership to Ford; sell the Honda dealership to the newly created entity, Fladeboe AG; sell the Volkswagen and Isuzu dealerships to another newly created entity, Fladeboe VW; and dissolve RFLM. The sale of the Honda dealership to Fladeboe AG and the sale of the Volkswagen dealership to Fladeboe VW were also structured so the purchasing entities would deliver to RFLM promissory notes for the sale price before RFLM's dissolution. The notes would be payable after RFLM's dissolution. Before dissolving, RFLM would assign the notes to Fladeboe personally.

## II. *RFLM Requests Isuzu's Consent to Transfer the Isuzu Dealership to Fladeboe VW.*

Fladeboe AG was incorporated in December 2001, and Fladeboe VW was incorporated in February 2002. Fladeboe has always been the sole shareholder and president of Fladeboe AG. He was the sole shareholder and president of Fladeboe VW until he transferred his shares to his son, Bruce Fladeboe, in August 2002.

RFLM sold its Isuzu dealership assets to Fladeboe VW in an asset purchase agreement dated February 19, 2002 (the Asset Purchase Agreement). Pursuant to the Asset Purchase Agreement, Fladeboe VW delivered to RFLM a promissory note for $1.5 million to pay for the Isuzu dealership assets. The Asset Purchase Agreement stated: "Buyer acknowledges that [R]FLM is winding up and will dissolve and that any damages from any breach may only be offset against the Promissory Note and Installment Obligation described in paragraph 1.2 of this Agreement." The Asset Purchase Agreement required the transaction close no later than 9:00 a.m. on March 31, 2002.

Under Vehicle Code section 11713.3, subdivision (d)(1), RFLM had to obtain Isuzu's approval of the dealership transfer to Fladeboe VW before it could operate as an Isuzu dealer. The Dealer Agreement gave Isuzu the right to terminate the Dealer Agreement if RFLM attempted to sell, transfer, or assign the Dealer Agreement, or the Isuzu dealership assets, without Isuzu's prior written consent, "which consent shall not be unreasonably withheld."

RFLM requested Isuzu to approve the transfer of the Dealer Agreement to Fladeboe VW and to issue an OL-124 form to Fladeboe VW. An OL-124 is a form which the State of California requires to be filed with the Department of Motor Vehicles (DMV) before an automobile dealer may sell the vehicles of a particular make and line. On March 19, 2002, Isuzu requested RFLM to submit various required documents that were missing from its dealership transfer approval request.

The usual procedure was to obtain consent to the transfer before the sale of the dealership is consummated. However, RFLM proceeded with selling the Isuzu dealership assets to Fladeboe VW before obtaining Isuzu's consent to the dealership transfer. In mid-March 2002, RFLM transferred all of its Isuzu dealership assets, including its inventory of 20 to 30 new Isuzu vehicles and its Isuzu automotive parts, to Fladeboe VW and/or Fladeboe AG. Fladeboe VW delivered to RFLM a promissory note for $1.5 million.

### III. *Fladeboe VW and Fladeboe AG Sell and Service Isuzu Vehicles and Automotive Parts After RFLM Dissolves.*

RFLM filed a certificate of dissolution on March 29, 2002. In that certificate, Fladeboe declared under penalty of perjury (1) RFLM had completely wound up its business, (2) its debts and liabilities had been paid, (3) known assets had been distributed, and (4) the corporation had been dissolved. Ford paid the $10 million due under the promissory note after RFLM filed the certificate of dissolution.

When RFLM filed its certificate of dissolution, Isuzu had not yet consented to RFLM's transfer of the Dealer Agreement to Fladeboe VW. Not until December 2002 did Isuzu learn that RFLM had transferred the dealership assets to Fladeboe VW and had dissolved.

Fladeboe knew that once RFLM dissolved, it could not continue conducting Isuzu dealership operations. After March 29, 2002, Fladeboe VW and Fladeboe AG sold and serviced Isuzu vehicles without Isuzu's consent and without a license to do so. Fladeboe VW and Fladeboe AG were able to sell and service Isuzu vehicles without Isuzu's knowledge and consent by using the unique dealer code number that Isuzu had assigned exclusively to RFLM. A dealer cannot transfer its code number; when Isuzu approves a dealership transfer, it assigns a new code number to the new dealership. By using RFLM's dealer code number, Fladeboe AG and/or Fladeboe VW were able to obtain over $214,000 in sales incentives and over $171,000 in warranty reimbursements from Isuzu, which believed it was dealing with its authorized dealer, RFLM.

Isuzu approved the request to transfer the Dealer Agreement from RFLM to Fladeboe VW on April 23, 2002, and presented a new dealer sales and service agreement for Fladeboe VW to sign. Fladeboe, who was Fladeboe VW's president, refused to sign the new agreement.

### IV. *RFLM Requests Isuzu's Consent to Transfer the Isuzu Dealership to Fladeboe AG.*

Bruce Fladeboe, for whom Fladeboe VW had been created, later decided he did not want an Isuzu dealership because of poor sales. As a result, in

October or November 2002, Fladeboe withdrew the request for consent to transfer the Dealer Agreement from RFLM to Fladeboe VW, and asked for Isuzu's consent to transfer the agreement from RFLM to Fladeboe AG instead. Until this time, Isuzu had not heard of Fladeboe AG. By November 6, 2002, all of the necessary paperwork in connection with the proposed transfer to Fladeboe AG had been submitted to Isuzu. Under Vehicle Code section 11713.3, subdivision (d)(2)(B), Isuzu had 60 days following November 6, 2002, in which to approve or deny the proposed transfer.

On November 25, 2002, before Isuzu acted on the transfer request, RFLM filed a petition with the California New Motor Vehicle Board (NMVB) requesting it order Isuzu to issue a form OL-124 to Fladeboe AG. In connection with the petition, RFLM submitted a copy of its certificate of dissolution filed on March 29, 2002. Isuzu was surprised to learn its dealer, RFLM, had been dissolved eight months earlier and had only now notified Isuzu of the dissolution.

On January 3, 2003, Isuzu notified RFLM that it had declined to approve the proposed transfer of the Dealer Agreement to Fladeboe AG. Isuzu based its decision on the following: (1) "[t]he dissolution of [RFLM] and your non-disclosure of that event"; (2) "[t]he unauthorized transfer of the Isuzu hard assets to Fladeboe [AG], and your non-disclosure of that event"; (3) "[t]he wrongful performance and reporting of warranty and pre-delivery inspection claims"; (4) "[t]he wrongful performance and reporting of retail sales"; (5) "[t]he non-disclosure and misrepresentation to [Isuzu] of the true ownership of the entity holding the Isuzu hard assets"; (6) "[t]he failure of [RFLM] to conduct customary sales and service operations since its March 2002 corporate dissolution"; and (7) "Fladeboe [AG]'s direct involvement and participation in the above unauthorized events."

In a letter dated January 7, 2003, the DMV notified Fladeboe it had cancelled RFLM's dealer license. After conducting a hearing on January 8, 2003, the NMVB denied RFLM's petition to order Isuzu to issue a form OL-124 to Fladeboe AG.

### PROCEEDINGS IN THE TRIAL COURT

In April 2003, Fladeboe AG and Fladeboe filed this lawsuit against Isuzu based on its refusal to consent to the dealership transfer. The second amended complaint, the operative complaint, added RFLM as a plaintiff and asserted causes of action for (1) violation of Vehicle Code sections 11713.3, subdivisions (d)(1), (e), and (g), and 11726; (2) breach of the Dealer Agreement; (3) intentional interference with economic relations; (4) negligent interference with economic relations; and (5) declaratory and injunctive relief.

The second amended complaint alleged Isuzu unreasonably withheld consent to transfer the Isuzu dealership and wrongfully refused to issue a form OL-124 to Fladeboe AG or Fladeboe VW. The second amended complaint sought a declaration that Fladeboe VW or Fladeboe AG is "entitled to be issued a Form OL-124 with respect to the transfer of assets from RFLM, and with respect to the sale of new I[suzu] vehicles under the franchise agreement, and that I[suzu]'s refusal to issue the Form OL-124 and failure to comply with the Vehicle Code, [are] unreasonable."

Isuzu cross-complained against Fladeboe and Fladeboe AG alleging they failed to disclose RFLM's dissolution, fraudulently represented to Isuzu that RFLM was still in existence, and fraudulently sought vehicle incentive payments, warranty reimbursements, and Isuzu parts purchases on behalf of RFLM after it had been dissolved. The cross-complaint alleged that, since March 30, 2002, Fladeboe and Fladeboe AG "have continued to order, receive, and resell at a profit, Isuzu parts and accessories and received payment from Isuzu for warranty repairs, including over $200,000 in warranty labor credit and almost $50,000 in Isuzu replacement parts credit and received over $250,000 in vehicle sales incentive and advertising payments from Isuzu." The cross-complaint sought damages for fraud, trademark infringement, and trade name infringement, and restitution under Business and Professions Code section 17200.

The trial court bifurcated the case and tried Plaintiffs' declaratory relief cause of action in the first phase. In a minute order dated March 8, 2005, at the end of the first phase of trial, the court found that Plaintiffs did not have standing to seek declaratory relief against Isuzu. The trial court also found in favor of Isuzu on its unclean hands defense, stating: "Having dissolved and distributed all other known assets to its shareholders (and pre-dissolution having transferred all its interest in the Isuzu franchise to F[ladeboe ]VW), this Court sitting as a Court of Equity finds that the evidence does not support, nor would it be equitable to allow [R]FLM to use its 'admitted' failure to comply with Vehicle Code Section 11713.3(d)(1) to sue Isuzu under a theory that [R]FLM still holds the franchise rights because the sale to F[ladeboe ]VW did not meet the statutory requirements. Simply put, the totality of the evidence establishes that [R]FLM and the other Plaintiffs have unclean hands."

In a second minute order dated March 8, 2005, the trial court concluded that in light of its disposition of the declaratory relief cause of action, "nothing remains of the Plaintiffs' Complaint." Accordingly, only Isuzu's cross-complaint was tried before the jury in the second phase of trial. The jury found against Fladeboe and Fladeboe AG on Isuzu's claims for fraud and negligent misrepresentation and awarded Isuzu $114,642.87 in damages.

After hearing argument, the trial court separately ruled in favor of Isuzu on its claim for unfair competition under Business and Professions Code section 17200. The court found Fladeboe AG violated section 17200 by (1) selling and servicing Isuzu vehicles without a license from the DMV; and (2) using RFLM's Isuzu dealer identification number to obtain new vehicles, sales incentive payments, and warranty repair reimbursements from Isuzu. The court found Isuzu was entitled to recover restitution from Fladeboe AG in the amount of $214,300, representing money paid as dealer sales incentives. A judgment entered on August 19, 2005, awarded Isuzu a total of $214,300 in damages and restitution.

Plaintiffs appealed from the judgment and from the March 8, 2005 minute order adjudicating their complaint. In an order issued on January 26, 2007, we noted the judgment entered on August 19, 2005, is not an appealable final judgment because it adjudicated the cross-complaint but not the complaint. (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743 [29 Cal.Rptr.2d 804, 872 P.2d 143]; see *Angell v. Superior Court* (1999) 73 Cal.App.4th 691, 698 [86 Cal.Rptr.2d 657].) To preserve appellate jurisdiction, we treat the two March 8, 2005 minute orders and the judgment on the cross-complaint as constituent parts of a single judgment entered on August 19, 2005, and construe the notice of appeal as timely taken from that judgment.

## DISCUSSION

### I. Trial Phase I: Plaintiffs' Declaratory Relief Cause of Action

The trial court severed the declaratory relief cause of action of the second amended complaint and tried it first. In the declaratory relief cause of action, Plaintiffs sought a declaration that "Plaintiff Fladeboe VW or F[ladeboe AG] [is] entitled to be issued a Form OL-124 with respect to the transfer of assets from RFLM, and with respect to the sale of new I[suzu] vehicles under the franchise agreement, and that I[suzu's] refusal to issue the Form OL-124 and failure to comply with the Vehicle Code, [are] unreasonable."

### A. Did Plaintiffs Have Standing?

■ The trial court found that Plaintiffs lacked standing to seek declaratory relief. "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute." (Code Civ. Proc., § 367.) The real party in interest has " 'an actual and substantial interest in the subject matter of the action,' and stands to be 'benefited or injured' by a judgment in the action." (*City of Santa Monica v. Stewart* (2005) 126

Cal.App.4th 43, 59–60 [24 Cal.Rptr.3d 72].) "Plaintiffs have standing to sue if they or someone they represent have either suffered or are threatened with an injury of sufficient magnitude to reasonably assure the relevant facts and issues will be adequately presented." (*City of Irvine v. Irvine Citizens Against Overdevelopment* (1994) 25 Cal.App.4th 868, 874 [30 Cal.Rptr.2d 797].)

We can readily conclude Fladeboe had no standing to seek declaratory relief or to assert any of the claims alleged in the complaint. He was never an Isuzu dealer. He was not a party to the Dealer Agreement with Isuzu or the Asset Purchase Agreement with Fladeboe VW. Fladeboe was the sole shareholder of RFLM and is the sole shareholder of Fladeboe AG. As a shareholder, Fladeboe did not have standing to assert corporate claims, except in a derivative action. (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106–107 [81 Cal.Rptr. 592, 460 P.2d 464]; *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 228 [26 Cal.Rptr.3d 798].)

It appears, however, that Fladeboe AG and RFLM had standing to seek declaratory relief against Isuzu. The trial court found that Fladeboe AG lacked standing because "there is no evidence the rights to the Isuzu franchise were ever transferred, sold or assigned to it by F[ladeboe ]VW or anyone else." Fladeboe AG was the proposed transferee of the Dealer Agreement and stood to benefit if Isuzu approved the transfer. Isuzu's denial of RFLM's request to transfer that agreement therefore threatened Fladeboe AG with an injury "of sufficient magnitude to reasonably assure the relevant facts and issues will be adequately presented." (*City of Irvine v. Irvine Citizens Against Overdevelopment, supra*, 25 Cal.App.4th at p. 874.)

The trial court concluded RFLM lacked standing to seek declaratory relief because RFLM had closed the transaction with Fladeboe VW, wound up its business, and dissolved without obtaining Isuzu's consent to transfer the Dealer Agreement. Filing a certificate of dissolution did not deprive RFLM of standing to assert claims against Isuzu arising out of the attempted transfer of the Dealer Agreement. Corporations Code section 2010, subdivision (a) states: "A corporation which is dissolved nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it and enabling it to collect and discharge obligations, dispose of and convey its property and collect and divide its assets, but not for the purpose of continuing business except so far as necessary for the winding up thereof." Once a corporation files a certificate of dissolution, its corporate existence ceases except for the limited purpose of winding up its affairs. (*Catalina Investments, Inc. v. Jones* (2002) 98 Cal.App.4th 1, 7 [119 Cal.Rptr.2d 256].) Since the proposed transfer of the Dealer Agreement to Fladeboe VW was never consummated, that agreement remained an asset of RFLM notwithstanding its certificate of dissolution.

RFLM's attempt to transfer the Dealer Agreement to Fladeboe AG seems to have been part of the winding up of RFLM's affairs rather than a continuation of RFLM's business.

Although RFLM and Fladeboe AG had standing to seek declaratory relief against Isuzu, they could not prevail on the merits. As explained in the next subparts, all the Plaintiffs had unclean hands, and the evidence supported an implied finding Isuzu did not unreasonably withhold consent from RFLM's request to transfer the Dealer Agreement.

### B. *Plaintiffs Had Unclean Hands.*

The trial court found Plaintiffs had unclean hands based on (1) RFLM's failure to comply with Vehicle Code section 11713.3, subdivision (d) and Plaintiffs' use of RFLM's license to sell and service Isuzu vehicles after RFLM dissolved. Substantial evidence supports the trial court's unclean hands findings which, we conclude, provided Isuzu a complete defense.

■ "The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 [90 Cal.Rptr.2d 743].) The doctrine of unclean hands requires unconscionable, bad faith, or inequitable conduct by the plaintiff in connection with the matter in controversy. (*General Elec. Co. v. Superior Court* (1955) 45 Cal.2d 897, 899–900 [291 P.2d 945]; *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 446 [99 Cal.Rptr.2d 678].) Unclean hands applies when it would be inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action. (*Dickson, Carlson & Campillo v. Pole, supra,* 83 Cal.App.4th at p. 447; *Kendall-Jackson Winery, Ltd. v. Superior Court, supra,* 76 Cal.App.4th at pp. 978, 986.) "Whether the defense applies in particular circumstances depends on the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries." (*Dickson, Carlson & Campillo v. Pole, supra,* 83 Cal.App.4th at p. 447.)

Vehicle Code section 11713.3, subdivision (d)(1) makes it unlawful for a vehicle manufacturer to prevent a dealer from selling or transferring a dealership. It states, in part: "No dealer, officer, partner, or stockholder shall, however, have the right to sell, transfer, or assign the franchise, or any right thereunder, without the consent of the manufacturer or distributor except that the consent shall not be unreasonably withheld." (Veh. Code, § 11713.3, subd. (d)(1).)

Vehicle Code section 11713.3, subdivision (d)(2)(A) makes it unlawful "[f]or the transferring franchisee to fail, prior to the sale, transfer, or assignment of a franchisee or the sale, assignment, or transfer of all, or substantially all, of the assets of the franchised business or a controlling interest in the franchised business to another person, to notify the manufacturer or distributor of the franchisee's decision to sell, transfer, or assign the franchise." In addition, section 11713.3, subdivision (e) provides: "There shall be no transfer or assignment of the dealer's franchise without the consent of the manufacturer or distributor, which consent shall not be unreasonably withheld or conditioned upon the release, assignment, novation, waiver, estoppel, or modification of any claim or defense by the dealer." Finally, section 11713, subdivision (m) makes it unlawful for the holder of a dealer's license to "[p]ermit the use of the dealer's license, supplies, or books by any other person for the purpose of permitting that person to engage in the purchase or sale of vehicles required to be registered under this code."

The evidence presented in the first phase of trial established Plaintiffs violated those Vehicle Code sections and acted inequitably. In March 2002, RFLM sold the Isuzu dealership assets and assigned the Dealer Agreement to Fladeboe VW. In violation of Vehicle Code section 11713.3, subdivision (d), the transaction closed, and the Isuzu dealership purportedly transferred to Fladeboe VW, without Isuzu's consent. RFLM filed a certificate of dissolution in March 2002, but never told Isuzu it had dissolved. Fladeboe knew that once RFLM had dissolved, it could not continue using its license to serve as an authorized Isuzu dealer. Yet, Fladeboe VW and Fladeboe AG, with RFLM's assistance, carried on the Isuzu dealership without a form OL-124, continued selling and servicing Isuzu vehicles without Isuzu's authorization, and submitted claims to Isuzu for reimbursement of warranty repairs.

Plaintiffs' Vehicle Code violations and misconduct were directly related to the claimed injuries and causes of action. In fact, as explained, *post*, Plaintiffs' misconduct was the very reason for Isuzu's denial of RFLM's request to transfer the dealership to Fladeboe AG. The trial court was fully justified in finding Plaintiffs had unclean hands.

■ Plaintiffs argue unclean hands is not a defense to standing—"A plaintiff either has standing or not"—they argue. In *Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 730–731 [146 P.2d 673], the California Supreme Court confirmed that a trial court may refuse to consider granting declaratory relief if it finds the plaintiff has unclean hands. The *Maguire* court stated the trial court "should not merely dismiss the action" for unclean hands, but should adjudicate the defense with the merits of the declaratory relief cause of action. (*Id.* at p. 731.) Here, the trial court did not dismiss the

declaratory relief cause of action, but adjudicated the unclean hands defense based on the evidence presented during the trial of the declaratory relief cause of action.

Further, we do not read the trial court's unclean hands findings as relating only to standing. "Simply put," the court stated, "the totality of the evidence establishes that [R]FLM and the other Plaintiffs have unclean hands." We agree. As we read the trial court's order and findings, the unclean hands finding pertains to the substance of the complaint and provided a complete defense to the declaratory relief cause of action.

### C. *Isuzu Reasonably Withheld Consent from RFLM's Request to Transfer the Dealer Agreement.*

#### 1. *The Doctrine of Implied Findings*

The doctrine of implied findings compels us to conclude the trial court found against Plaintiffs on the merits of their declaratory relief cause of action. In response to our invitation, Plaintiffs and Isuzu submitted, respectively, supplemental briefs on two issues not addressed in the parties' appellate briefs: (1) May we infer the trial court made implied factual findings favorable to Isuzu on the question whether it unreasonably withheld consent to the request or requests made by RFLM to transfer the Isuzu dealership; and (2) does substantial evidence support any such implied factual findings?

The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment. (*Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1942 [56 Cal.Rptr.2d 589].) The doctrine is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227] (*Arceneaux*); *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 [240 Cal.Rptr. 872, 743 P.2d 932].)

In a bench trial, how does an appellant obtain a record affirmatively proving the trial court erred by failing to make factual findings on an issue? The appellant must secure a statement of decision under Code of Civil Procedure section 632 *and*, pursuant to Code of Civil Procedure section 634, bring any ambiguities and omissions in the statement of decision to the trial court's attention. In *Arceneaux*, the California Supreme Court explained:

"Sections 632 and 634 [of the Code of Civil Procedure] . . . set forth the means by which to avoid application of these inferences in favor of the judgment. When the court announces its tentative decision, a party may, under section 632, request the court to issue a statement of decision explaining the basis of its determination, and shall specify the issues on which the party is requesting the statement; following such a request, the party may make proposals relating to the contents of the statement. Thereafter, under section 634, the party must state any objection to the statement in order to avoid an implied finding on appeal in favor of the prevailing party." (*Arceneaux, supra,* 51 Cal.3d at p. 1133, fns. omitted.)

██ Securing a statement of decision is the first step, but is not necessarily enough, to avoid the doctrine of implied findings. Litigants must also bring ambiguities and omissions in the statement of decision's factual findings to the trial court's attention—or suffer the consequences. Code of Civil Procedure section 634 states if omissions or ambiguities in the statement of decision's factual findings are timely brought to the trial court's attention, "it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue."

The *Arceneaux* court explained the "clear implication" of Code of Civil Procedure section 634 is that if a party fails to bring omissions or ambiguities in the statement of decision's factual findings to the trial court's attention, then "that party waives the right to claim on appeal that the statement was deficient in these regards," and the appellate court will infer the trial court made implied factual findings to support the judgment. (*Arceneaux, supra,* 51 Cal.3d at pp. 1133–1134.) "[S]ection 634 clearly refers to a party's need to point out deficiencies in the trial court's statement of decision as a condition of avoiding such implied findings, rather than merely to request such a statement initially as provided in section 632." (*Id.* at p. 1134.) In contrast, a party does not waive objections to legal errors appearing on the face of the statement of decision by failing to respond to it. (*United Services Auto. Assn. v. Dalrymple* (1991) 232 Cal.App.3d 182, 186 [283 Cal.Rptr. 330].)

Thus, as the *Arceneaux* court explained, the statutes describe a two-step process for avoiding implied factual findings. First, a party must request a statement of decision pursuant to Code of Civil Procedure section 632. (*Arceneaux, supra,* 51 Cal.3d at p. 1134.) Second, if the trial court issues a statement of decision, a party claiming omissions or ambiguities in the factual findings must bring the omissions or ambiguities to the trial court's attention. (*Ibid.*)

If the party challenging the statement of decision fails to bring omissions or ambiguities in it to the trial court's attention, then, under Code of Civil

Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues. (*Arceneaux, supra*, 51 Cal.3d at pp. 1133–1134; *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 [17 Cal.Rptr.3d 96]; *Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 140 [80 Cal.Rptr.2d 126].) The appellate court then reviews the implied factual findings under the substantial evidence standard. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793 [218 Cal.Rptr. 39, 705 P.2d 362]; *SFPP v. Burlington Northern & Santa Fe Ry. Co., supra*, 121 Cal.App.4th at p. 462; *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1277 [90 Cal.Rptr.2d 41].) "[The appellant] did not raise any objections to the statement of decision. We therefore are required to presume the trial court made all findings necessary to support the judgment." (*Sammis v. Stafford, supra*, 48 Cal.App.4th 1935, 1942.)

At the close of the first phase of trial in this case, no party requested a statement of decision. The trial court issued a minute order with factual findings, and no party objected to those findings or brought to the trial court's attention any ambiguities or omissions in the minute order's factual findings. At the close of the second phase of trial, Fladeboe and Fladeboe AG requested a statement of decision, but only on these three specific findings: (1) that Fladeboe AG sold Isuzu vehicles to the public without a dealer's license from the DMV; (2) that Fladeboe AG used RFLM's Isuzu dealer identification number to order new vehicles and parts from Isuzu and to obtain dealer sales incentives and warranty repair reimbursements; and (3) that Fladeboe AG received money from Isuzu and used it for its own purpose.

None of the Plaintiffs requested a statement of decision regarding the declaratory relief cause of action. Thus, RFLM and Fladeboe AG failed to preserve a record demonstrating the trial court did not resolve, or erroneously resolved, the issue whether Isuzu unreasonably withheld consent to the transfer of the Isuzu dealership.

In their supplemental brief, Plaintiffs argue we should not infer the trial court made implied findings favorable to Isuzu because the "main" topic discussed during the first phase of trial "concerned the question of whether the appellants had standing." Standing was perhaps the main issue argued during the first phase of trial, but it was not the only one.

The record demonstrates Plaintiffs had a full and fair opportunity to try—and did try—their declaratory relief cause of action. The record does not show the trial court limited evidence and argument to the standing issue.

Plaintiffs' trial brief argued Isuzu unreasonably withheld consent to the proposed transfer to Fladeboe AG. At the outset of trial, the court made clear, "[w]e're going to approach the case in terms of trying the declaratory relief action, what rights[,] duties and obligations do the plaintiffs in this action . . . have with respect to the franchise agreement and the relief they seek based on the fifth cause of action." The trial court declined to rule on the issue of standing, telling Isuzu's counsel, "[y]ou'll have to make your record on the position." Later, in the midst of the first phase of trial, the court stated, "I think . . . we've all agreed we're on the same page as to what this phase is dealing with, which seems to be basically the declaratory relief claim."

During the first phase of trial, Plaintiffs presented witnesses and offered exhibits on the merits of their declaratory relief cause of action. Although the trial court permitted Isuzu to make a continuing objection based on standing, Plaintiffs do not show the objection was ever sustained or interfered with their presentation of evidence. At the end of the first phase of trial, the court permitted the parties to submit briefs arguing the evidence without restriction.

Plaintiffs could have made their first step toward meeting their burden of proving error by requesting that the trial court issue a statement of decision on the issue whether Isuzu unreasonably withheld consent to RFLM's request to transfer the Dealer Agreement to Fladeboe AG (or imposed unreasonable conditions on the request to transfer the Dealer Agreement to Fladeboe VW). Presented with such a request, the trial court might have responded in any one of four ways: (1) issue a statement of decision with factual findings on the issues presented; (2) issue a statement of decision that makes no factual findings on the issues presented; (3) issue a statement of decision expressly stating it was not making factual findings on the issues presented; or (4) decline to issue any statement of decision. In the case of alternative 3 or 4, Plaintiffs would have been able to meet their burden on appeal of proving the trial court did not make factual findings on the consent issue. In the case of alternative 1 or 2, Plaintiffs could have avoided the doctrine of implied findings by bringing any ambiguities or omissions in the statement of decision's factual findings to the trial court's attention.

However, Plaintiffs neither requested a statement of decision on their declaratory relief cause of action nor informed the trial court of any ambiguities or omissions in its findings in the minute order. Plaintiffs failed to take any steps toward creating a record affirmatively showing the trial court did not make factual findings on the consent issue or made erroneous findings.

Given this record, we must infer the trial court, after giving Plaintiffs a full and fair opportunity to try their declaratory relief action, made every factual finding necessary to support its decision. Because the judgment is presumed

correct, and because Plaintiffs bore the burden of affirmatively proving error, the doctrine of implied findings instructs us to infer the trial court made every implied factual finding necessary to support the conclusion that Isuzu reasonably withheld consent to RFLM's request to transfer the Isuzu dealership to Fladeboe AG. As we explain, *post*, that conclusion is legally sound and supported by substantial evidence.

The application of the doctrine of implied findings in this case illustrates the doctrine's wisdom. In the first phase of trial, the parties fully litigated the issue whether Isuzu unreasonably withheld consent to RFLM's request to transfer the Isuzu dealership to Fladeboe AG. The trial court considered all of the evidence and ruled in Isuzu's favor. Plaintiffs failed to take any of the steps necessary to meet their burden of proving the trial court did not make factual findings on the consent issue or made erroneous findings. The time and expense of a retrial would serve no purpose other than to give Plaintiffs a second chance to meet their burden of preserving a record demonstrating error.

### 2. *The Legal Standard for Withholding Consent to a Request for a Dealership Transfer*

■ What is the legal standard for our review of the trial court's implied finding that Isuzu did not unreasonably withhold consent? There are few cases interpreting the phrase "unreasonably withheld" as used in Vehicle Code section 11713.3, subdivision (d)(1) or (e). In *In re Van Ness Auto Plaza, Inc.* (Bankr. N.D.Cal. 1990) 120 B.R. 545, 549 (*Van Ness*), the court concluded: "[W]ithholding consent to assignment of an automobile franchise is reasonable under California Vehicle Code section 11713.3(e) if it is supported by substantial evidence showing that the proposed assignee is materially deficient with respect to one or more appropriate, performance-related criteria. This test is more exacting than whether the manufacturer subjectively made the decision in good faith after considering appropriate criteria. It is an objective test that requires that the decision be supported by evidence. The test is less exacting than one which requires that the manufacturer demonstrate by a preponderance of the evidence that the proposed assignee is deficient."

■ The *Van Ness* court identified relevant criteria to include "(1) whether the proposed dealer has adequate working capital; (2) the extent of prior experience of the proposed dealer; (3) whether the proposed dealer has been profitable in the past; (4) the location of the proposed dealer; (5) the prior sales performance of the proposed dealer; (6) the business acumen of the proposed dealer; (7) the suitability of combining the franchise in question with other franchises at the same location; and (8) whether the proposed

dealer provides the manufacturer sufficient information regarding its qualifications." (*Van Ness, supra,* 120 B.R. at p. 547.) The court explained that "[a]lthough the initial burden of explaining the basis for the decision is on the manufacturer, the ultimate burden of persuasion is on the assigning dealer to demonstrate that the manufacturer's refusal to consent is unreasonable." (*Id.* at p. 549.)

The *Van Ness* standard, we believe, "strikes an appropriate balance between the interests of the manufacturer and the interests of the franchisee." (*In re Claremont Acquisition Corp., Inc.* (Bankr. C.D.Cal. 1995) 186 B.R. 977, 985–986 [adopting *Van Ness* standard].) Because *Van Ness* interpreted the meaning of the term "consent shall not be unreasonably withheld" under the consent provisions of Vehicle.Code section 11713.3, the *Van Ness* standard applies equally to the term "consent shall not be unreasonably withheld" in the parallel provisions of the Dealer Agreement.

As the *Van Ness* court indicated, its list of relevant criteria the manufacturer may consider is not exhaustive. In addition to the criteria listed in *Van Ness,* the dealer's honesty and good faith in its relations with the manufacturer are directly related to the dealer's performance under a dealer franchise agreement. A manufacturer has the right to expect honesty and good faith from its dealers, and therefore may consider those qualities when assessing a request for a dealership transfer. A dealer's honesty and good faith are particularly important to the manufacturer when deciding whether to approve a transfer of the dealership to a person or entity owned or controlled by, or closely related to, the transferring dealer.

### 3. *Isuzu's Reasons for Withholding Consent*

The trial court's implied finding that Isuzu reasonably withheld consent to RFLM's request to transfer the dealership to Fladeboe AG meets the *Van Ness* standard and is supported by substantial evidence. Isuzu met its initial burden under the *Van Ness* test of explaining the basis for its decision. In January 2003, Isuzu gave RFLM these reasons for declining to approve its request to transfer the Dealer Agreement to Fladeboe AG: (1) "[t]he dissolution of [RFLM] and your non-disclosure of that event"; (2) "[t]he unauthorized transfer of the Isuzu hard assets to Fladeboe [AG], and your non-disclosure of that event"; (3) "[t]he wrongful performance and reporting of warranty and pre-delivery inspection claims"; (4) "[t]he wrongful performance and reporting of retail sales"; (5) "[t]he nondisclosure and misrepresentation to [Isuzu] of the true ownership of the entity holding the Isuzu hard assets"; (6) "[t]he failure of [RFLM] to conduct customary sales and service operations since its March 2002 corporate dissolution"; and (7) "Fladeboe [AG]'s direct involvement and participation in the above unauthorized events."

Isuzu's reasons met the legal standard for reasonableness. RFLM's unauthorized transfer of the dealership assets to Fladeboe VW materially impaired Fladeboe AG's ability to serve as an Isuzu dealer. RFLM was asking Isuzu to commit itself to a long relationship with Fladeboe AG. Isuzu had the right to expect that its dealer and the proposed new dealer act honestly and in good faith. It was not unreasonable for Isuzu to decline to place its trust in two entities, both owned by the same person, that had treated it dishonestly in their business relationship.

Substantial evidence supported Isuzu's reasons for declining to approve the transfer. RFLM sold its Isuzu dealership assets, including the vehicle fleet and parts inventory, to Fladeboe VW in February 2002 without obtaining Isuzu's consent to the transfer. Fladeboe did not inform Isuzu of the sale until December 2002, even though he knew that once RFLM had dissolved, it would be illegal to use its license to sell and service Isuzu vehicles as an authorized Isuzu dealer. In fact, Fladeboe never informed Isuzu that RFLM had wound up and dissolved. Isuzu learned of RFLM's dissolution only after RFLM filed a petition with the NMVB in November 2002 requesting it order Isuzu to issue a form OL-124 to Fladeboe AG.

The trial court heard testimony establishing that between April and December 2002, Fladeboe AG sold Isuzu vehicles and parts and performed warranty repair work without a license to do so. Fladeboe AG did not tell Isuzu it was acting as an Isuzu dealer. Conversely, RFLM had not, since March 2002, performed its obligations as an authorized Isuzu dealer by selling and servicing Isuzu vehicles.

Not only did substantial evidence support an implied finding that Isuzu did not unreasonably withhold consent transferring the Isuzu dealership to Fladeboe AG, but we agree with Isuzu that, in light of Plaintiffs' conduct, it would have been "unthinkable" for Isuzu to consent to RFLM's transfer request. The claims alleged against Isuzu in the second amended complaint were based on Isuzu's refusal to consent to RFLM's request to transfer the dealership. Since Isuzu did not unreasonably withhold consent to the request, all of Plaintiffs' claims against Isuzu fail.

## II.   *Trial Phase II: The Jury Verdict*

Isuzu alleged Fladeboe and Fladeboe AG committed fraud or made negligent misrepresentations by failing to disclose or by concealing RFLM's dissolution, by secretly operating as an Isuzu dealership using RFLM's dealer identification number, and by misrepresenting to Isuzu that RFLM was still acting as its authorized dealer. During the second phase of trial, Isuzu presented evidence establishing it paid Fladeboe and/or Fladeboe AG

$214,300 in dealer sales incentives and $171,216 in warranty repair reimbursements. The jury awarded Isuzu $114,642.87 in damages on its claims for fraud and negligent misrepresentation against Fladeboe and Fladeboe AG.

To recover for fraud, a plaintiff must prove loss proximately caused by the defendant's tortious conduct. (Civ. Code, § 1709; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 718, p. 1041.) "Deception without resulting loss is not actionable fraud." (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818 [52 Cal.Rptr.2d 650] (*Medallion*).) We review the evidence in the light most favorable to Isuzu to determine whether substantial evidence supports the jury's award of damages. (*Ajaxo, Inc. v. E*Trade Group, Inc.* (2005) 135 Cal.App.4th 21, 55 [37 Cal.Rptr.3d 221]; 8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 37, p. 542.)

Relying on *Medallion* and *Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172 [88 Cal.Rptr.2d 718], Fladeboe and Fladeboe AG argue their failure to inform Isuzu of RFLM's dissolution did not cause Isuzu any damage. In *Medallion*, the plaintiff entered into a contract with the defendant to provide cleaning services. (*Medallion, supra,* 44 Cal.App.4th at p. 1818.) Both sides performed their contractual obligations for several months, until the defendant terminated the contract. (*Id.* at pp. 1818–1819.) The plaintiff sued the defendant for fraud, alleging it spent money on cleaning supplies and equipment in reliance on the defendant's representations. (*Id.* at p. 1818.) The court held the plaintiff could not recover those expenses as damages for fraud because the plaintiff had to incur the expenses to perform its contractual obligations. (*Id.* at pp. 1818–1819.) "It was only when [the defendant] terminated the parties' contractual relationship that [the plaintiff] could have perceived its reliance expenses as 'losses.' Thus, it was the termination, not the misrepresentation, that resulted in the alleged harm." (*Id.* at p. 1819.)

In *Auerbach v. Great Western Bank, supra,* 74 Cal.App.4th at page 1185, the plaintiffs asserted that a bank's promise to engage in good faith negotiations to modify a loan caused the plaintiffs to continue making payments on a note secured by undervalued property. The court rejected that theory because the plaintiffs had a contractual obligation to make payments on the note notwithstanding the bank's promise to renegotiate its terms. (*Id.* at pp. 1185–1187.)

Fladeboe and Fladeboe AG similarly assert their misrepresentations and omissions caused Isuzu no damage because it was contractually obligated to make dealer sales incentive payments and warranty repair reimbursements notwithstanding RFLM's dissolution. Isuzu had no contractual relationship, however, with Fladeboe or Fladeboe AG. The Dealer Agreement was between

Isuzu and RFLM. By failing to inform Isuzu of RFLM's dissolution, and by fraudulently using RFLM's dealer identification number, Fladeboe and Fladeboe AG caused Isuzu to make payments to them—to which Isuzu owed no contractual obligations.

We also must ask whether the damages awarded are otherwise legally permissible and supported by substantial evidence. Isuzu contends it was damaged by Fladeboe and Fladeboe AG's fraud because it made warranty reimbursement and dealer incentive payments "*it absolutely would not have made had it known that it was making the payments to an entity that was not an authorized Isuzu dealer.*" Under California law, a defrauded party is ordinarily limited to recovering out-of-pocket damages. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240 [44 Cal.Rptr.2d 352, 900 P.2d 601].) The out-of-pocket measure of damages " 'is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received.' " (*Ibid.*)

At the time RFLM filed its certificate of dissolution, Isuzu had not made the challenged warranty reimbursement and dealer incentive payments. From that point until the time Isuzu discovered the fraud, it paid Fladeboe and or Fladeboe AG $214,300 in dealer sales incentives and $171,216 in warranty repair reimbursements. The warranty repairs, if not made at Fladeboe AG, would have been made at an authorized Isuzu dealership, to which Isuzu would have been obligated to make reimbursement payments. Apparently for that reason, the trial court did not permit Isuzu to recover restitution under its unfair competition law claim for warranty repair reimbursements. Because Isuzu would have been obligated to make warranty reimbursement payments to some Isuzu dealer, Isuzu was not damaged by making those warranty repair reimbursement payments to Fladeboe and Fladeboe AG.

Whether Isuzu suffered damages by making dealer sales incentive payments to Fladeboe and Fladeboe AG depends on whether the vehicles for which those incentives were paid were part of RFLM's existing inventory when RFLM dissolved. Why? The purpose of Isuzu's dealer sales incentive program was "to assist our dealers in competing against the competition and drawing their attention to our product, trying to get them to sell our product." The dealer sales incentive program consisted primarily of dealer cash incentives (rebates) paid by Isuzu when the dealer recorded a vehicle sale, and volume sales bonuses paid when the dealer recorded the requisite volume of sales. Isuzu legitimately could claim it was damaged by making dealer sales incentive payments to Fladeboe and Fladeboe AG for sales of RFLM's *existing inventory*, because those vehicles had already been delivered to RFLM as of the beginning of the fraud. Had Isuzu known of the fraud, it

could have legitimately refused to make dealer incentive payments for the vehicles sold out of RFLM's existing inventory.

But Isuzu suffered no damage for dealer incentives paid for sales of vehicles acquired by Fladeboe and Fladeboe AG after RFLM's dissolution. That is because if Isuzu had known of the fraud, it would not have shipped Fladeboe VW or Fladeboe AG any new vehicles after RFLM's dissolution. The vehicles that were delivered to Fladeboe AG after RFLM's dissolution, absent the fraud, would have been delivered instead to authorized Isuzu dealers. Isuzu would have had to make dealer incentive payments to the authorized dealers when those vehicles were sold.

The jury did not award Isuzu the full amount of damages it sought. Isuzu paid Fladeboe and Fladeboe AG $214,300 in dealer sales incentives and $171,216 in warranty repair reimbursements, while the jury awarded Isuzu $114,642.87. Considering the scope of the permissible damages, we can reasonably conclude from the verdict: (1) the jury denied Isuzu any recovery on warranty repair reimbursements, and (2) the jury limited Isuzu's recovery for dealer sales incentive payments to payments made on inventory existing as of RFLM's dissolution. That was a permissible measure of recovery, and Fladeboe and Fladeboe AG have not demonstrated error in the calculation of damages.

Fladeboe and Fladeboe AG argue Isuzu suffered no damages because Corporations Code section 2010, subdivision (a) permitted RFLM to continue conducting operations as part of its winding up. RFLM represented in its certificate of dissolution filed on March 29, 2002, that it had completed the winding-up process and had distributed its assets. More importantly, Fladeboe and Fladeboe AG fraudulently induced Isuzu to make dealer sales incentive payments and warranty reimbursements to *them*, not to RFLM.

Fladeboe and Fladeboe AG also argue they "had no independent duties to Isuzu to disclose any thing [*sic*] to Isuzu" because neither was a party to the Dealer Agreement with Isuzu or the Asset Purchase Agreement between RFLM and Fladeboe VW. However, Fladeboe and Fladeboe AG failed to disclose RFLM's dissolution and fraudulently used RFLM's dealer identification number to induce Isuzu to pay them dealer sales incentives and warranty repair reimbursements to which they were not entitled.

### III. *Liability Under Business and Professions Code Section 17200*

After the jury trial ended, the trial court found that Fladeboe AG violated Business and Professions Code section 17200 by (1) selling Isuzu vehicles to

the public without a dealer sales license issued by the DMV, and (2) using RFLM's dealer identification number to order new vehicles and parts and to obtain dealer sales incentive payments and warranty repair reimbursements from Isuzu. The trial court concluded Isuzu should recover as restitution the $214,300 it paid as dealer sales incentives, but not the amount it paid in warranty repair reimbursements to Fladeboe AG.

Fladeboe AG challenges the trial court's decision on the Business and Professions Code section 17200 claim on several grounds, none of which has merit. First, Fladeboe AG argues the trial court's determination on standing impaired its ability to balance the equities. Fladeboe AG cites nothing to support its assertion the trial court could not fairly and dispassionately resolve the section 17200 claim. To the contrary, the record discloses the trial court fully considered the evidence and fairly resolved the section 17200 claim. The record amply supports the court's findings that Fladeboe AG engaged in unlawful and unfair business practices.

Second, Fladeboe AG asserts the trial court's finding that it sold vehicles without a license is technically incorrect because it did have a license to sell new motor vehicles. The significant point is that Fladeboe AG did not have a form OL-124 permitting it to sell Isuzu vehicles. Thus, the trial court's finding is not erroneous.

Third, Fladeboe AG argues its unfair conduct did not injure Isuzu because it "did not show that it could have earned more from any other dealer had it sold the vehicles and parts to another dealer." The measure of recovery for unfair business practices is restitution, not damages. Under Business and Professions Code section 17203, the court may make an order or judgment "as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." The California Supreme Court has defined an order under section 17203 for restitution as one " 'compelling a UCL [unfair competition law] defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144–1145 [131 Cal.Rptr.2d 29, 63 P.3d 937].)

Fladeboe AG wrongfully obtained dealer sales incentive payments from Isuzu by using RFLM's dealer identification number to falsely represent itself as an authorized Isuzu dealer. The trial court correctly, and wisely, ordered Fladeboe AG to return the money it obtained from Isuzu through that unfair business practice.

■■■ Fourth, Fladeboe AG argues Vehicle Code section 11713.3, subdivision (d) and Corporations Code section 2010, subdivision (a) gave it a "safe harbor" for its conduct. In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 184 [83 Cal.Rptr.2d 548, 973 P.2d 527], the California Supreme Court concluded "a plaintiff may not bring an action under the unfair competition law if some other provision bars it." This statutory safe harbor must "actually bar" the action, and not "merely fail to allow it." (*Ibid.*) "Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision." (*Id.* at p. 183.)

Fladeboe AG argues Vehicle Code section 11713.3, subdivision (d) provided it a safe harbor by permitting a motor vehicle dealer to transfer its dealership, subject to the manufacturer's consent. "[I]t is evident," Fladeboe AG argues, "that attempts to consummate a transfer do not have the quality of wrongfulness that [Business and Professions Code] section 17200 was designed to redress." But Isuzu did not assert, and the trial court did not find, wrongful conduct based on the attempt to transfer RFLM's Isuzu dealership. The trial court found Fladeboe AG engaged in wrongful conduct by fraudulently representing itself as an authorized Isuzu dealer—both to the public and to Isuzu—without obtaining Isuzu's consent and without the requisite form OL-124. Vehicle Code section 11713.3 does not provide a safe harbor for such conduct; to the contrary, subdivision (f)(1) of section 11713.1 prohibits it.

Fladeboe AG argues Corporations Code section 2010, subdivision (a) permits a dissolved corporation to wind up its affairs. That is true, but section 2010 does not permit a dissolved corporation or its assignees to wind up the corporation's affairs through wrongful, unfair, or fraudulent practices. Moreover, Fladeboe AG was not a dissolved corporation winding up its affairs.

Finally, Fladeboe AG asserts that RFLM's request in March 2002 to transfer the Isuzu dealership to Fladeboe VW "was sufficient to invoke the consent obligations imposed on Isuzu and was sufficient to trigger the safe harbor features." RFLM's request to transfer the Isuzu dealership to Fladeboe VW did not give Fladeboe AG (or Fladeboe VW for that matter) safe harbor to pass itself off as an authorized Isuzu dealership without Isuzu's consent.

## DISPOSITION

The judgment is affirmed. Respondent shall recover costs incurred in this appeal.

Bedsworth, Acting P. J., and O'Leary, J., concurred.

A petition for a rehearing was denied May 23, 2007, and on April 24, 2007, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 22, 2007, S153281.