Filed 6/26/15  In re M.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E062232 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ120447) |
| v. | OPINION |
| C.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown Guy B. Pittman and Carol Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION[1]

Appellant C.S. is the mother of M.S., born in August 2000. After nearly two years of dependency jurisdiction, the court granted legal guardianship to the maternal aunt and her husband, W.M. and A.M., in 2012. After another two years, in September 2014, the court granted a petition to allow the aunt and uncle to adopt M.S., then age 14. Mother appeals from the termination of her parental rights, arguing the parental-benefit exception should apply and claiming she was prevented by the legal guardians from maintaining a meaningful relationship with her daughter.

We hold the juvenile court properly found no exception applied and was required to terminate parental rights and order that M.S. be adopted. (§ 366.26, subds. (b) and (c).)

II

FACTUAL AND PROCEDURAL BACKGROUND

*A. Detention*

In 2010, mother and her husband, A.B., M.S.'s stepfather, were living with M.S. in Riverside. In September 2010, the Department of Public Social Services (DPSS) received several referrals, reporting that M.S. was neglected and overweight, and that mother was abusing drugs, regularly driving under the influence, and not in compliance with parole conditions related to vehicle violations and a drug possession conviction.

---

[1] All statutory references are to the Welfare and Institutions Code unless stated otherwise.

2

M.S. had not attended school since January 2010 and mother claimed she was homeschooling her daughter. On October 7, 2010, when mother attempted to enroll M.S. in an elementary school, DPSS intervened. The investigating social worker suspected mother was under the influence but mother could not provide a saliva swab for a drug test. Mother was arrested on an outstanding felony warrant related to the previous drug conviction. A glass pipe was found in her purse.

In an interview, M.S. was well-dressed, healthy, and articulate. She reported that mother and stepfather often fought, and stepfather threw things. Both smoked substances, using "clear glass." M.S. was placed on an emergency basis with her maternal aunt and uncle.

B. *Dependency Petition*

On October 12, 2010, DPSS filed a section 300 petition with the juvenile court, alleging M.S. came within the provisions of subdivisions (b) and (g) because mother had an ongoing substance abuse problem, neglected M.S. by not obtaining dental and medical care, and engaged in altercations with the stepfather in the child's presence. No parent was available to care for M.S. because mother was in custody and the biological father's whereabouts were unknown.

In November 2010, mother was in jail in Banning. M.S. was living with the maternal relatives and receiving necessary dental and medical treatment and attending school. Notwithstanding some health issues, she was regarded as articulate and normal, and presented no difficulties at school.

3

W.M. told DPSS that C.S., her sister, had become addicted to prescription medication as a young adult and later began using cocaine and methamphetamine. Mother had completed two drug programs but relapsed. Mother stole from the family.

## C. *Jurisdictional and Dispositional Hearing*

At the combined jurisdictional and dispositional hearing on November 15, 2010, mother was present and submitted to the DPSS recommendations. The court sustained the petition, declared M.S. a dependent child, ordered she be removed from parental custody, and directed DPSS to provide family reunification services.

## D. *Six-Month Status Review*

Mother enrolled in a county mental health program in 2011. She completed 17 group, and six individual counseling sessions at the Department of Mental Health. Mother had negative drug tests in January and February 2011, and a positive test for cocaine on March 14, 2011. In April 2011, mother was released from custody and entered an inpatient drug program where she participated in domestic violence counseling, parenting classes and drug education seminars.

Mother visited M.S. regularly for two hours each Sunday under the supervision of A.M. Although the visits went well, mother did not always attend the entire allotted time, arriving late or leaving early.

M.S. was described as a healthy, normal 10 year old, who was bonded to her maternal relatives, and received excellent care from them. She attended fourth grade at a private school and received individual counseling from a therapist who recommended visitation continue to be supervised.

4

In May 2011, W.M. and A.M., filed a request for de facto parent status. The juvenile court conducted a six-month review hearing, finding that M.S. was in need of continued supervision of the juvenile court. The court authorized DPSS to liberalize visitation to allow M.S. and mother to have supervised visits at mother's residential program.

*E. Twelve-Month Status Review*

Mother completed a parenting course in July 2011. On July 28, 2011, over mother's objection, the juvenile court granted W.M. and A.M. de facto parent status with access to the case file.

In November 2011, mother was still living in the residential program and receiving counseling. Her therapist said she participated "fully and conscientiously" and he had "no concerns about her ability to provide appropriate care for [M.S.]." Mother had also "received domestic violence training, class room instruction, lectures" and specialized individual attention to address family violence issues. Additionally, Mother had completed an inpatient drug treatment program on October 31, 2011, had tested negative drug tests for six months, and attended a 12-step program. She was also working as a security guard. Mother had two hour visits with M.S. on Sundays. DPSS concluded a substantial probability existed that M.S. and mother would be reunified shortly, and recommended unsupervised overnight visits begin. In mid-November mother moved into her own apartment.

M.S., age 11, continued to live with her maternal relatives. She told the supervising social worker she enjoyed living with her aunt and uncle but also enjoyed

visiting her mother.  The maternal relatives were concerned about the disruption caused by M.S.'s potential return to mother.

On November 15, 2011, at the 12-month review hearing, the court authorized M.S.'s return to mother, upon successful completion of a home study and successful unsupervised visitation.  In January 2012, DPSS recommended additional services and expanded visitation in anticipation of M.S.'s placement with mother following the child's completion of the school year and successful completion of conjoint counseling.

On February 16, 2012, mother tested positive for amphetamine use.  Later, in March 2012, mother admitted that she had begun using drugs four or five times in recent weeks.  Her husband had also used methamphetamine, making it difficult for her to resist.

By April 2012, mother was unemployed and living in a Redlands apartment.  She had no recent contact with law enforcement.  She had enrolled in an aftercare drug program and continued in a 12-step program.

Meanwhile, M.S. was doing well and visiting her mother regularly.  M.S. expressed discomfort about having unsupervised or overnight visits with her mother.

*F.  Eighteen-Month Status Review, First Section 366.26 Hearing*

In April 2012, the court found that, despite reasonable family reunification services, mother had not made enough progress within the time allowed by law.  The court terminated family reunification services and set the matter for a section 366.26 permanency planning hearing.

In June 2012, DPSS reported that M.S. was an adoptable child but her aunt and uncle were willing to provide her with a permanent home without adoption.  M.S. had

6

lived with them since October 2010 and wished to remain. At the section 366.26 hearing on June 14, 2012, the court placed M.S. in a legal guardianship with W.M. and A.M. and terminated dependency jurisdiction. The court ordered mother to have visitation "as directed by the legal guardian." Mother did not appeal from these proceedings.

*G. Section 388 Petition, Request to Change Court Order, JV-180*

In March 2014, the legal guardians filed a section 388 petition requesting the dependency be reinstated so they could adopt M.S. M.S. was thriving personally and academically. She was in seventh grade and involved in dance, choir, theater and ice skating. She enjoyed participating in therapy. She called W.M. and A.M. her parents and wanted to be adopted. M.S. initiated the topic of adoption because "I see them as my parents. I love having a family that I can rely on. We live in one of the best areas of Hawthorne. There's food on the table and in the fridge. They provide for me. I'm sure of where I am as a person emotionally and physically."

M.S. was having supervised visits with mother about every three months. M.S. complained that the visits were often "awkward," that mother talked mostly about herself and did not ask about M.S. and her life. M.S. was not opposed to reducing visits. M.S. told mother she wanted to be adopted. Mother was frustrated because she felt she could not talk to M.S. in a satisfactory way while their visits were supervised by A.M. A.M. would not allow mother to have M.S.'s telephone number.

On May 22, 2014, the juvenile court granted the section 388 petition, reinstating the juvenile dependency over M.S., and setting the matter for a new section 366.26 hearing. Mother's whereabouts were unknown at that time.

7

In August 2014, M.S. turned 14.  The section 366.26 report and adoption assessment concluded that M.S. was in good health and developmentally normal.  She was outgoing, friendly, had a good vocabulary, and was an excellent student.  Her ongoing therapy was successful.  Mother had contacted M.S. one time for a visit but M.S. did not want to see her mother while the adoption was pending because it was "awkward."  W.M. and A.M. presented no legal detriment to adoption, understood the legal and financial obligations, and were committed to caring for M.S. permanently.[2]

H.  *Second Section 366.26 Hearing*

The second section 366.26 hearing was conducted in September 2014.  At that time, M.S. wished to proceed with the adoption.  Mother testified she was the fulltime caretaker for M.S. until age 10.  The last visit she had with M.S. was in April 2014 for two hours in a restaurant while A.M. supervised.  They discussed adoption but M.S. was upset.  Mother was not permitted to have telephone contact with M.S. and had not talked with her on the telephone for three years.  A.M. would not allow her to have M.S.'s phone number.  Mother had written at least 50 letters to M.S. but received responses to only a few.  They had some communication by email.  A.M. and W.M. had prevented mother from seeing M.S. and had inhibited their visits.  Mother reported that her sister, W.M., had refused to speak with her for four years.  Mother asked to visit M.S. for her birthday but A.M. said the child was "busy all summer."  Mother believed M.S. was being influenced to be estranged from her, which would damage the child in the future.

_____

[2]  A.M. is a practicing California lawyer.

Mother wanted to have post-adoption visitation and she said M.S. had told her that, after the adoption, the aunt and uncle were not going to be able to prohibit contact. Mother's counsel argued that, although it was a standard order for mother to have reasonable visitation at the discretion of the guardians, the visitation had been unreasonably restricted since June 2012.

Minor's counsel represented to the court that M.S. wanted the adoption to proceed but, while the adoption was pending, M.S. felt visitation was uncomfortable. However, she wanted to be able to continue visits later. W.M. and A.M. were willing to defer to M.S.'s wishes. W.M. and A.M.'s lawyer argued they had been cooperative with visitation and that M.S. was "conflicted about . . . being adopted and letting her mother know that." DPSS argued there was not a bond between mother and M.S. and M.S. would benefit more from the stability her aunt and uncle would provide.

The court took judicial notice that mother's failure to be rehabilitated had affected her visitation and placement rights. Additionally, mother's location was often unknown. The court then commented, "mother is not the victim in this case. She had quite a bit of time for reunification with [M.S.], was unable to reunify due to narcotic issues that never did get resolved. [I]t is not surprising . . . the current guardians, did not allow more unsupervised visitation. . . . [¶] [M.S.] does need protection. . . . [¶] Additionally, the child is asking to be adopted. . . . [¶] . . . [¶] Adoption is in her best interest . . . ." The court also noted that, following the termination of parental rights, M.S. was free to visit mother. The court found mother had failed to show that any exception to termination of

9

parental rights applied. The court found that M.S. was adoptable and terminated parental rights.

III

THE PARENT-CHILD RELATIONSHIP EXCEPTION

A. *General Principles*

At the section 366.26 hearing, if it is likely the child will be adopted, the court is required to terminate parental rights unless a statutory exception exists. The court must terminate parental rights unless, under section 366.26, subdivision (c)(1)(B)(i), the court "finds a compelling reason for determining that termination would be detrimental to the child due to one or more" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1343) specified circumstances, including that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. . . ." (*Ibid.*; *In re Celine R.* (2003) 31 Cal.4th 45, 53; *In re C.B.* (2010) 190 Cal.App.4th 102, 122; *In re Scott B.* (2010) 188 Cal.App.4th 452, 469; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

*Autumn H.* construed the beneficial relationship exception to mean that "the [parental] relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) The juvenile court's obligation is to "balance[] the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of

10

a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

We apply the substantial evidence standard of review as to the existence of a beneficial parental relationship, and the abuse of discretion standard of review to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) Under either standard of review, the analysis is essentially the same: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . . "'" [Citations.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)

Here mother urges the trial court erred in failing to find that her relationship with M.S. constituted a compelling reason not to terminate parental rights. We completely reject mother's argument.

B. *Regular Visitation*

To establish the beneficial relationship exception, a parent must show regular visitation. Although mother generally maintained regular visitation with M.S. during the original dependency period between October 2010 and June 2012, she was never able to have unsupervised visitation. After the guardianship was ordered, mother visited

occasionally but M.S. did not welcome the contact because it was awkward.  Between March 2014 and September 2012, mother had only one visit with M.S.  Mother's disappearance and unavailability between March and August 2014 certainly had a bearing on the issue of visitation.

There is no evidence, as mother claims, that the guardians thwarted her efforts to contact M.S. even if M.S. did not often respond to her written correspondence.  Most teenagers probably do not write letters anymore.  Additionally, her guardians justifiably allowed M.S. to refuse visits as long as the child's preference was not the only factor.  (*In re S.H.* (2003) 111 Cal.App.4th 310, 317-320.)  Furthermore, it was necessary for the visits to be supervised for M.S.'s comfort and safety.  Therefore, mother did not satisfy the regular visitation requirement of subdivision (c)(1)(B)(i).

## C.  Unclean Hands

Mother also contends her efforts at visitation were thwarted by the conduct of the guardians.  As a new theory on appeal, she argues for the application of the doctrine of unclean hands, when a party "has violated conscience, good faith or other equitable principle in his prior conduct."  (*Lynn v. Duckel* (1956) 46 Cal.2d 845, 850; *Pond v. Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 290.)  We decline to consider this new theory, not raised below.  (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 562.)

Furthermore, unclean hands operates as defense to legal and equitable causes of action.  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 56.)  It seemingly has no application here where DPSS is not asserting legal or equitable claims

12

and, instead, mother has the burden to establish a statutory exception to termination of parental rights.  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

In any event, the record does not support a claim of unclean hands.  Mother contributed to the irregularity of visitation by not initiating visits and by not maintaining contact.  Mother was never allowed to have unsupervised visits because of her unresolved issues of substance abuse.  It was mother, not her sister and brother-in-law, who failed to participate in regular visitation.

*D.  Benefit to the Child*

Next, mother did not sufficiently show M.S. would be deprived of a substantial, positive emotional attachment, the loss of which would cause her great harm.  (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853.)  Mother had no parental role in the life of M.S.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.)  During the four years between October 2010 and September 2014, when they had become increasingly estranged, mother never successfully rehabilitated herself.

Additionally, there was no irreparable harm to M.S. caused by terminating parental rights.  The juvenile court observed that, once the adoption was completed, the adoptive parents could allow M.S. to continue to see her mother if she wished.  M.S. was living in a stable, permanent home where all her needs were being met.  (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)  M.S. regarded her aunt and uncle as her parents The adoption desired by both M.S. and her guardians unquestionably promises the greatest benefit to M.S.  (*In re C.B., supra,* 190 Cal.App.4th at pp. 123-129.)

## IV

## DISPOSITION

No exception applied to the termination of parental rights.  (§ 366.26, subds. (b)

and (c).)  We affirm the judgment of the juvenile court.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


HOLLENHORST
Acting P. J.


KING
J.