Filed 11/4/20  In re Kayhlin W. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re KAYHLIN W., a Person Coming Under the Juvenile Court Law. | B302895 <br><br> (Los Angeles County Super. Ct. No. 18LJJP00658A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent. <br><br> v. <br><br> ANDREW W., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Steven E. Ipson, Juvenile Court Referee.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel for Plaintiff and Respondent.

Andrew W. (father) appeals from orders made at a Welfare and Institutions Code section 387 hearing.[1]  The Department of Children and Family Services (DCFS) filed the section 387 petition concerning father's fifth child, Kayhlin (born July 2018), who was initially permitted to remain with her parents after birth despite the parents having open cases regarding Kayhlin's four older siblings.[2]  The juvenile court sustained the section 387 petition as to Kayhlin on October 11, 2019, finding the allegations against father to be true and removing the child from the parents' custody.  After receiving further evidence, the juvenile court announced its disposition orders on November 25, 2019.  Because father was found not to have made reasonable efforts to treat the problems that led to the prior removal of his children from his care and the prior termination of his parental rights, the juvenile court denied father reunification services.

Father argues that the juvenile court's jurisdictional findings and orders must be reversed because the juvenile court failed to ensure compliance with the Indian Child Welfare Act (ICWA).  Further, he argues that substantial evidence does not support the juvenile court's decision to deny him reunification services as to Kayhlin.  Since we find that father has failed to show error, we affirm the juvenile court's findings and orders.

_____

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2]    Kayhlin's four older siblings, Andrew (born 2008); Khailan (born 2009) Camiyah (born 2012) and Kamerhon (born 2016) are not subjects of this appeal.  However, they will be mentioned as necessary.

## FACTUAL AND PROCEDURAL BACKGROUND
**Prior proceedings regarding the family**

Father and Candi C. (mother)[3] have five children together, and a prior history with DCFS. In May 2015, after receiving information that the parents used drugs and there was no food in the home, DCFS filed a petition on behalf of the children, Andrew, Khailan and Camiyah, who were then detained from the parents. When Kamerhon was born in the spring of 2016, he tested positive for amphetamines. DCFS filed a petition on Kamerhon's behalf in April 2016, and he too was detained from the parents. Amended petitions were eventually sustained as to all four children, and the parents were allowed monitored visits.

Throughout the case the parents were in minimal compliance with court ordered services. Reunification services were terminated as to all four children in September 2017. Camiyah and Kamerhon were placed together in a foster home and the parents' parental rights to these two children were ultimately terminated.[4]

**Initial referral and investigation for Kayhlin**

During the proceedings regarding the four older siblings, Kayhlin was born in July 2018. A DCFS social worker came to the hospital upon receiving a report that mother had a history of illegal drug use and had not reunified with four older children. Mother then also claimed that she was homeless. DCFS was informed that mother's toxicology report was negative and there

_____

[3]      Mother is not a party to this appeal.

[4]      This court affirmed the juvenile court's termination of parental rights as to Camiyah and Kamerhon. (*In re Camiyah W.* (Jan. 29, 2020, B297759) [nonpub. opn.].)

was no toxicology report for Kayhlin.  It was later discovered that the hospital actually had no toxicology report for mother.

The parents were asked to drug test.  In July 2018, mother failed to test, but provided paperwork showing that her failure to test was due to the expiration of her identification.  Father's test results were blank, and it was later discovered that he had provided a fake urine sample.  The parents were informed that they needed to continue to drug test to avoid having Kayhlin detained.  On September 4, 2018, the social worker spoke with a lab technician to determine why some of the parents' drug tested show that they tested but no actual results were recorded.  The lab technician explained that the parents must have provided samples that were not urine.  When the social worker informed father of the issue, he blamed the drug testing site.  On October 2, 2018, the lab provided a negative drug test for father and a "no show" for mother.

**Section 300 petition**

On October 4, 2018, the juvenile court granted a removal order for Kayhlin.  On October 10, 2018, DCFS filed a petition pursuant to section 300 seeking protection of Kayhlin.  The petition alleged under section 300, subdivision (b), that both parents had a history of substance abuse which rendered them incapable of caring for Kayhlin.  Under section 300, subdivision (j), the petition further alleged that the child's four older siblings received permanent placement services due to the parents' substance abuse.

Both parents appeared for the arraignment and detention hearing and were appointed counsel.  The court declined to detain Kayhlin and ordered the parents to take an on-demand drug test.  The court gave DCFS permission to remove Kayhlin

4

from the parents if they tested positive for drugs or alcohol. The detention hearing was continued to October 12, 2018. However, on October 12, 2018, the parents' drug tests were still pending. The juvenile court continued its release of Kayhlin to the parents over DCFS's objection.

On October 15, 2018, DCFS notified the court that mother's drug test was negative. On October 19, 2018, DCFS notified the court that the drug testing agency believed that father used some sort of device when testing because the sample was insufficient and not within body temperature. Due to the insufficient sample, there was no result. However, on October 15, 2018, both parents tested negative. Kayhlin remained released to the parents over DCFS's objection, with DCFS ordered to provide family maintenance services. Drug testing of the parents was a condition of release.

**Jurisdiction/disposition**

DCFS filed its jurisdiction/disposition report on November 27, 2018. Mother admitted to using methamphetamine and marijuana for approximately four years, however, she claimed that she was presently sober. Father stated that he and mother began using drugs at the same time, and both stopped using drugs at the same time. Father also admitted that he introduced mother to drug use and provided her with methamphetamine. Father did not have a start date for his sobriety but stated it was around September or October 2017.

Regarding his prior court ordered drug treatment, father claimed that he had almost completed it when he was discharged for being two minutes late for a treatment session. Father said he had not been able to get back into the program, although he intended to try to do so. When asked about his lengthy history of

missed drug tests since 2015, father stated that he and mother were using, and that they were not making the drug testing a priority. Father's last positive test for methamphetamine was on April 13, 2016.

DCFS continued to recommend that Kayhlin be removed from the parents' custody and the parents be ordered to complete a substance abuse program with random testing.

In December 2018, both parents pled no contest to an amended petition. Counts b(1) and b(2) were found true and sustained pursuant to the no contest plea, and the remaining counts were dismissed. At the disposition hearing on January 28, 2019, the juvenile court declared Kayhlin a dependent of the court but released her to her parents. The parents were ordered to complete a program of drug rehabilitation with random testing and participate in psychological assessment and individual counseling.

**First section 387 petition**

On February 21, 2019, DCFS filed a petition pursuant to section 387 alleging that the prior disposition orders had not been effective in protecting Kayhlin.[5] Mother had a diluted drug test on December 31, 2018, and failed to appear for a drug test on January 28, 2019. On January 29, 2019, the DCFS social worker asked mother about the parents' progress in a drug program, to which mother stated that they had been approved to walk in for an appointment the following day. On February 4, 2019, mother tested negative for drugs. However, when the social worker

_____

[5] Section 387, subdivision (a), permits the juvenile court to modify a previous order by removing the child from the physical custody of a parent after noticed hearing upon a supplemental petition.

checked in again on February 13, 2019, the parents still had not enrolled in a drug treatment program. Mother explained that father worked and needed his rest.

Though father tested negative for all substances on January 30, 2019, his urine was diluted.[6] Father's urine was again diluted on February 1, 2019, and on February 15, 2019, father failed to test.

DCFS requested a removal order, which was granted. However, when the social worker went to the parents' motel room, only father was present, and he claimed not to know where mother and Kayhlin were. The parents checked out of the motel the following day, and left no forwarding address. They also did not answer their cell phones.

Father and mother appeared for the arraignment and detention hearing on February 21, 2019. Kayhlin was detained in shelter care, and both parents tested negative for drugs. At the continued hearing on March 4, 2019, the juvenile court released Kayhlin to the parents.

**Jurisdiction/disposition report and dismissal**

In the jurisdiction/disposition report filed on April 11, 2019, father stated that he and mother had made finding a place to live a higher priority than drug treatment. He and mother had an assessment with Tarzana Treatment Center but they were told they did not qualify for the program. They were then referred to a program called A New Vision for You, and were waiting to begin the program. Father explained that his diluted test results were due to his drinking a lot of water, at the direction of his doctor due to swelling related to high blood pressure. Father was

---

[6] The comment "diluted" on a drug test indicates that the level of creatine is lower than accepted.

trying to get to 12-step meetings three times per week but the distance from his job prevented him from going as often as he wanted. Father met with a therapist weekly at his place of employment, for 30 minutes per session. Father admitted to taking Prozac but was trying to get a doctor appointment to change his medication for mental health.

On April 17, 2019, the juvenile court dismissed the section 387 petition with prejudice.

**Second section 387 petition**

On April 25, 2019, DCFS made an ex-parte request to detain Kayhlin from father. On April 23, 2019, the social worker learned from the lab where father had been testing that father had been using a device to tamper with his drug tests.[7] In an incident report dated April 9, 2019, a supervisor wrote: "[Father] has been observed on several occasions using a device or extension tube for leaving a specimen at new directions site #31. It was noted on chain of custody form every time that I witnessed the tube being used."

The social worker spoke to the manager for support services at the lab, who reported that standard procedures would be for the collector to stop the drug test, tell the client to step outside the testing room, inform them that an incident report would be generated and DCFS would be notified. However, the collector reported that the bathroom is too small, and when

_____

[7] The report read as follows:
"02/15/2019 – Remark: Device Used
"02/21/2019 – Remark: Not Enough to Cause Temp
"03/04/2019 – Remark: Device Used
"03/06/2019 – Remark: Device Used
"03/19/2019 – Remark: Device Used
"04/05/2019 – Remark: Device Used."

8

clients are confronted they become hostile. The collector did not want to upset the client.

On April 29, 2019, the juvenile court detained Kayhlin from father, and ordered father to drug test at a different drug testing location.

On May 1, 2019, DCFS filed a section 387 petition alleging that the prior orders had not been effective in protecting Kayhlin. The juvenile court detained Kayhlin from father on May 2, 2019, and ordered DCFS to do a hair follicle drug test on father.

On June 19, 2019, DCFS filed a last-minute information for the court indicating that father's car had been seen at mother's address and male clothing was found in the home. A similar incident occurred in July 2019. A social worker observed father's car hidden on the other side of the block; father drive away from the home, shirtless, only a few minutes after a social worker knocked on the door. Later father returned and demanded that the social worker leave his house, and threatened the social worker. DCFS requested that Kayhlin be detained from mother.

When DCFS went to the home to detain the child, father was there in a locked bedroom, and denied that mother or Kayhlin were in the home. The social worker and law enforcement then found mother and Kayhlin hiding in a bathroom.

On August 5, 2019, the juvenile court made detention findings as to mother and ordered family reunification services for the parents. The following day, DCFS filed a first amended section 387 petition.

**Adjudication and disposition of second section 387 petition**

In its six-month review report, DCFS reported that mother completed a 12-week outpatient program at the New Visions facility with Dr. Arisah Muhammad. Father completed the same program, and Dr. Muhammad reported that father was very focused during the 12-week course on addiction education.

At the October 4, 2019 hearing, DCFS reported that both parents had consistently tested negative for drugs since the beginning of September 2019. DCFS presented the documentary evidence from the case, then rested. Father called the former social worker on the case to testify, and testified himself. Father described his participation in Dr. Muhammad's program, and stated that he was attending 12-step meetings. Father denied ever using a device to tamper with drug tests, and stated that Dr. Muhammad believed him. Father's counsel indicated that despite a subpoena being issued for the individual who collected the samples and reported the use of the device, the individual did not appear. The court declined to issue a warrant for his appearance. Father rested.

During closing argument father and mother requested that all of the allegations in the section 387 petition be dismissed. Counsel for Kayhlin and DCFS requested that the section 387 petition be sustained. On October 11, 2019, the juvenile court issued its decision that the allegations of the section 387 petition were true. The court set the matter for a disposition hearing.

Father was scheduled to take the hair follicle drug test on October 17, 2019, and was given a check for transportation expenses. Father missed the test, claiming he could not get off of work. The test was rescheduled for October 25, 2019, when

father could not test because of the Tick fire and freeway closures. The test was again rescheduled for October 30, 2019, and again father did not appear. The test was rescheduled for November 1, 2019.[8]

Father tested negative in four urine tests in October 2019, with one no-show.

The disposition hearing was held on November 12, 2019. The parents were not present. DCFS presented all of the documents it had previously introduced into evidence. Father then called Dr. Muhammad to testify.

Dr. Muhammad testified that she was both a cognitive behavior specialist and an addiction specialist. The parents had participated in her program for 12 weeks. Father never appeared to be using drugs during their sessions. Dr. Muhammad had heard that there were some problems with the testing at the site where father was reported to have used a device. The urine samples were not always handled correctly, and she was under the impression that the samples in question were not sealed in father's presence.

The matter was continued for the parents' testimony, at which time, father did not testify, but mother testified concerning her sobriety. Mother denied the social worker's claim that father had been in the home when the social worker saw his car hidden. Instead, mother said that he was only there to pick up work clothes.

In its decision of November 25, 2019, as to father, the court noted that while in a drug rehabilitation program, father used a device to thwart drug testing. In addition, father never took the

_____

[8] The November 12, 2019 supplemental report does not indicate an outcome for the November 1, 2019 scheduled test.

hair follicle test, although it was scheduled many times. Father made no reasonable efforts to treat the problems that led to the prior removal and prior terminations of parental rights. Thus, the juvenile court denied father reunification services.

The court declined to return Kayhlin to mother, but mother was granted reunification services.

On December 6, 2019, father filed his notice of appeal.

**Regarding ICWA compliance**

On October 10, 2018, mother informed DCFS that she might have Indian heritage through the paternal side of her family. At the arraignment and detention hearing, both mother and father completed Parental Notification of Indian Status forms. Mother claimed she might have Chicote heritage on her father's side of the family.[9] Father claimed no Indian heritage, but contended that mother might have Cherokee heritage. The juvenile court ordered DCFS to investigate the claims of Indian heritage.

In the December 5, 2018 jurisdiction/disposition report, DCFS reported that mother stated she might have Cherokee heritage. DCFS reminded the juvenile court that on June 3, 2016, the court found that there was no reason to believe that Kayhlin's full siblings had any Indian heritage.

On November 14, 2018, DCFS sent ICWA notices to the Cherokee tribes as well as the Secretary of the Interior and the Sacramento Area Director of the Bureau of Indian Affairs. The notices contained information about mother's parents, Rosann and Daniel, including their places and dates of birth. The notices

_____

[9]     There is no Chicote tribe listed in the federal register. (Indian Child Welfare Act; Receipt of Designated Tribal Agents for Service of Notice, 85 C.F.R. § 24005 et seq. (2020).)

also contained possible information about Kayhlin's maternal great-grandparents, as well as Daniel's adoptive father, who died in 1989, and Daniel's biological father.

In April 2019, DCFS reported that the following notices were delivered: BIA--Sacramento; Secretary of the Interior; Cherokee Nation of Oklahoma; Eastern Band of Cherokee Indians; and United Keetoowah Band of Cherokee Indians. There had been no further response from any tribe. DCFS provided an update in August 2019, indicating that there had been no responses from any tribes. DCFS requested that the juvenile court find that there was no reason to know that Kayhlin was an Indian child.

On November 18, 2019, at a disposition hearing on DCFS's section 387 petition, the juvenile court found that ICWA did not apply. The parties discussed on the record that ICWA notices had been sent, the time for receiving the notices had passed, and that DCFS was requesting that the court find that ICWA was not applicable. The court stated, "Indian Welfare Act is not applicable."

## DISCUSSION

### I. ICWA

Father contends that the ICWA notices did not contain adequate information for the tribes to conduct a meaningful investigation of Kayhlin's eligibility as a member of the tribes. For the reasons set forth below, we find that there was no violation of ICWA.

#### A. *Applicable law and standard of review*

"'Congress enacted ICWA in 1978 to protect Indian children and their tribes from the erosion of tribal ties and cultural heritage and to preserve future Indian generations. [Citations.]

13

"'Because the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents'" [citation], a tribe has the right to intervene in a state court dependency proceeding at any time [citation].  This significant right, however, is meaningless unless the tribe is notified of the proceedings. [Citation.]  "Notice ensures the tribe will be afforded the opportunity to assert its right under the [ICWA] irrespective of the position of the parents, Indian custodian, or state agencies.'" [Citation.]"  (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1466.) Thus, when DCFS seeks foster care placement or termination of parental rights, notice must be provided to the tribes if "the court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a).)  An Indian child is defined as any unmarried person under the age of 18 who is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4).)

ICWA has been incorporated into the dependency statutes. The Welfare and Institutions Code's definition of "reason to know" conforms to the definition provided by federal regulations. (§ 224.2, subd. (d).)  A juvenile court has "reason to know" that a child might be an Indian child if:

> "(1) A person having an interest in the child . . . informs the court that the child is an Indian child.
>
> "(2) The residence or domicile of the child, the child's parents, or an Indian custodian is on a reservation or in an Alaska Native village.
>
> "(3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered

14

information indicating that the child is an Indian child.

"(4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child.

"(5) The court is informed that the child is or has been a ward of a tribal court.

"(6) The court is informed that either parent or the child possesses an identification card indicating membership or citizenship in an Indian tribe."

(§ 224.2, subd. (d).)

The duty to provide notice is more narrow than the duty of inquiry. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 884.) It applies only when the court knows or has reason to know that an Indian child is involved in the proceedings. (§ 224.3, subd. (a).)

A juvenile court's findings of proper notice under ICWA are reviewed for substantial evidence. (*In re D.N.* (2013) 218 Cal.App.4th 1246, 1251.) A finding that ICWA notice was proper is reversible if the record lacks substantial evidence that the tribes received proper notice. (*In re Mary G.* (2007) 151 Cal.App.4th 184, 211.) The reviewing court does not reweigh the evidence, but determines whether, after resolving all evidentiary conflicts favorably to the juvenile court's order, and making all reasonable inferences from the evidence, there is substantial evidence to uphold the order. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1428.) The ultimate test is whether a reasonable trier of fact could have made the ruling in light of the

whole record. (*In re A.M.* (2010) 187 Cal.App.4th 1380, 1387-1388.)

**B. Substantial evidence supports the juvenile court's decision** Father admits that ICWA notices were sent to the appropriate tribes in this case. However, he takes the position that DCFS did not undertake adequate inquiry or notice to these tribes. Father argues that the notices did not provide the tribes with meaningful notice and an opportunity to participate in the proceedings. When the court made a finding that ICWA did not apply, there was no discussion about the ICWA notices and no inquiry as to whether DCFS had made any further investigation of this issue. The court did not indicate whether it had reviewed the ICWA notices. Thus, father argues, the court failed to meet its obligations of ensuring ICWA compliance. Father cites *In re J.M.* (2012) 206 Cal.App.4th 375, 380-381 for the proposition that, in the absence of adequate inquiry and notice, tribes do not have a meaningful opportunity to participate in the proceedings.

The record shows that DCFS investigated mother's possible Indian heritage. DCFS obtained relevant information about mother's parents, Rosann and Daniel, such as their places and dates of birth. Further information was obtained about Daniel's mother, his adoptive father and his biological father. There is no indication in the record that any information obtained provided DCFS with a "reason to know" that Kayhlin was an Indian child as that term is defined in section 224.2. Despite not having a "reason to know" that Kayhlin was an Indian child, DCFS sent notices to all of the Cherokee tribes containing Kayhlin's known heritage. Because DCFS sent the notice to the relevant tribes, any failures in DCFS's investigation were harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 837 [error is harmless unless it is

16

reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error].)

Father cites the "affirmative and continuing" duty of inquiry to determine whether a child might be an Indian child in dependency proceedings. (§ 224.2, subd. (a); *In re A.B.* (2008) 164 Cal.App.4th 832, 838.) The case does not suggest reversible error occurred here. The *A.B.* court determined that the failure to carry out this duty was harmless error where a parent had disclaimed Indian heritage in a prior proceeding involving a different child. (*Id.* at p. 843.) Further, "ICWA does not obligate the court or [DCFS] 'to cast about' for investigative leads. [Citation.]" (*In re A.M.* (2020) 47 Cal.App.5th 303, 323.) Where a parent does not provide a "viable lead" requiring an effort to locate and interview extended family members, the parent has failed to demonstrate reversible error. (*Ibid.*)

Father also appears to argue that the timing of DCFS's inquiry rendered it inadequate. Father suggests that DCFS relied on its previous inquiry rather than undertaking a current inquiry. Father cites *In re Breanna S.* (2017) 8 Cal.App.5th 636, 652 for the proposition that it is not the obligation of family members to volunteer information, but DCFS's duty to seek out Indian ancestry information. However, *Breanna S.* does not suggest error here. At least some of the information that the agency left out of the ICWA notices in that case "was known to [DCFS] and included in its jurisdiction/disposition report to the court, but omitted from the ICWA notices." (*Id.* at p. 651.) Here, in contrast, there is no suggestion that DCFS left out any known information.

Father also cites *In re K.R.* (2018) 20 Cal.App.5th 701, 709 as support for his position that the trial court was not permitted

17

to assume that the social worker had adequately investigated, but instead was required to inquire about those efforts to ensure compliance with ICWA and its mandates. In *K.R.,* the mother contended that the social services agency did not properly investigate the children's possible Cherokee heritage and omitted mandatory information from the ICWA notices sent to the tribes. (*Id.* at p. 705.) The mother pointed out specific paternal relatives who had not been interviewed regarding the children's possible Cherokee heritage. Here, in contrast, possible Cherokee heritage was only alleged on mother's side, and the record shows that DCFS obtained as much information as was available from mother's extended family.

*In re S.M.* (2004) 118 Cal.App.4th 1108 is also distinguishable. In *S.M.,* the agency failed to include information in the ICWA notices about two of the child's family members who were alleged to have Indian heritage. (*Id.* at p. 1116.) Here, in contrast, the possible Indian heritage was through mother's relatives. Known information regarding mother's parents, and mother's grandparents, was included in the forms sent to the Cherokee tribes. Although there was no "reason to know" that Kayhlin was an Indian child, the court in this matter used caution and sent notices with all of the available information to the Cherokee tribes. After such notice is given, "if neither BIA nor any tribe provides a determinative response within 60 days, then the court may find that ICWA does not apply to the proceedings." (*In re Isaiah W.* (2016) 1 Cal.5th 1, 15.) The juvenile court did not err in doing so here.

18

## II. Denial of reunification services

Father argues that no substantial evidence supports the juvenile court's order denying him reunification services. For the reasons set forth below, we find no error.

### A. *Applicable law and standard of review*

The juvenile court denied father reunification services pursuant to section 361.5, subdivision (b). Under that section, reunification services need not be provided to a parent where the court finds, by clear and convincing evidence, "[t]hat the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling . . . and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian." (§ 361.5, subd. (b)(10).) In addition, reunification services need not be provided if "the parental rights of a parent over any sibling or half sibling of the child had been permanently severed . . . and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." (§ 361.5, subd. (b)(11).)

An order denying reunification services under section 361.5, subdivision (b) is reviewed for substantial evidence. (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121.) We do not make credibility determinations or reweigh the evidence. (*Ibid.*) "Rather, we 'review the entire record in the light most favorable to the trial court's findings to determine if there is substantial evidence in the record to support those findings.' [Citation.] In doing so, we are mindful of the higher

19

standard of proof required in the court below when reunification bypass is ordered." (*Id.* at p. 1122.)

### B. Substantial evidence supported the juvenile court's denial of reunification services

Father argues that he made a reasonable effort to treat the substance abuse that led to the removal and termination of parental rights as to Kayhlin's siblings. Thus, father argues, he should have been granted reunification services as to Kayhlin.

The juvenile court's determination that father did not make a reasonable effort to treat his substance abuse issues is supported by the evidence. Starting with the first referral concerning the parents' older children in 2015, father missed drug tests and failed to comply with the court's orders. Father lost custody of his children in 2016 due to his failure to treat his substance abuse issues. Father admitted that he and mother were "using for the most part," and were not making drug testing a priority.

Since Kayhlin's birth in 2018, father continued to miss drug tests and attempt to thwart the testing process. Father provided diluted or false samples on several occasions in 2018 and 2019, and in April 2019 it was discovered that father had been using a device to tamper with his drug tests. When father was ordered to take a hair follicle drug test, father made excuses to reschedule the test four times. The record does not show that he ever took the test.

The juvenile court noted father's lengthy history of thwarting drug tests when it determined that father had not made reasonable efforts to overcome the problems that led to Kayhlin's siblings' removals. Father had been cheating on drug tests, and missing drug tests, throughout the entire proceeding.

When the court ordered father to take a test that would have been more difficult to obstruct, provided him transportation funds and allowed him to reschedule numerous times, father never appeared for the test.

Father argues that he made reasonable efforts to treat his substance abuse problem by completing a substance abuse treatment program after DCFS filed its section 387 petition and Kayhlin was detained from father. Father also argues that he tested negative in the seven months preceding the disposition hearings, with the exception of one missed test. Father fails to address the credibility issues he faced because of his attempts to thwart the testing process on so many occasions. Father also ignores his own failure to comply with the court's order to take a hair follicle drug test.

Father acknowledges that the "reasonable effort" language found in section 361.5, subdivisions (b)(10) and (b)(11) does not mean any effort. (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914 (*R.T.*)) "The reasonable effort requirement focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' [Citation]." (*Ibid.*) "'To be reasonable, the parent's efforts must be more than "lackadaisical or half-hearted."' [Citations.]" However, a reasonable effort is not synonymous with a cure. (*Ibid.*) In *R.T.*, the mother's substance abuse had been ongoing throughout the child's life. Although there was some evidence that she had a period of months during which her substance abuse was under control, there was no evidence in the record that mother had recently engaged in her court-ordered services "in any meaningful way." (*Id.* at p. 915.) Similarly, here, father's efforts to thwart and

21

avoid drug testing show that his participation was not meaningful.

Father cites *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87 as an example of a case where the record lacked clear and convincing evidence that the parents had not made a reasonable effort to treat their problems. In *Cheryl P.*, the juvenile court denied services based on the parents' failure to reunify with an older sibling, and its position that more services would not make any difference. "The court essentially adopted a 'fruitless' standard." (*Id.* at p. 97.) Because the juvenile court failed to make a finding that the parents did not make a reasonable effort to treat the problems that led to the removal of the sibling, the denial of reunification services was reversible error.

No such error occurred here. The juvenile court was focused on the correct standard -- whether father had made reasonable efforts to treat the problem that led to the removal of Kayhlin's older siblings. The evidence in the record supported the juvenile court's determination that he had not. Father's consistent efforts to avoid drug testing, and his pattern of deception, support the juvenile court's assessment that father had not followed through with the court's orders "in any meaningful way." (*R.T., supra,* 202 Cal.App.4th at p. 915.)

### C. Granting father reunification services would not be in Kayhlin's best interests

Section 361.5, subdivision (c)(2) provides that a court shall not order reunification services to a parent described in subdivision (b)(10) or (11), among other subdivisions, "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." Father suggests that it would be

22

in Kayhlin's best interests to offer him reunification services. Substantial evidence in the record supports the juvenile court's implied decision that it is not.[10]

Father's continued efforts to avoid facing the problem that led to the removal and termination of parental rights as to Kayhlin's older siblings suggests that it is not in the best interest of Kayhlin to reunify with father. Further, father has a history of undermining the court's orders to stay away from Kayhlin. Ultimately, Kayhlin was detained from mother due to father's disobedience of court orders and insistence on visiting the family home. Father behaved in an aggressive manner towards the social worker who attempted to enforce the court's orders. Under the circumstances, the juvenile court did not err in concluding that additional reunification services to father were not in the child's best interest.

_____

[10]    Father argues that the juvenile court did not address the issue of Kayhlin's best interests at the disposition hearing, but instead focused on father's past conduct. Under the doctrine of implied findings, we are required to "infer the trial court made all factual findings necessary to support the judgment. [Citation.]" (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.) The doctrine is a "logical corollary to three fundamental principles of appellate review:  (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error. [Citations.] (*Ibid.*) Because father failed to ask the court to address this omission at the disposition hearing, we infer that the trial court made implied factual findings in support of its decision, and review those factual findings for substantial evidence. (*Id.* at p. 60.)

**DISPOSITION**

The orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT