Filed 5/13/22  In re H.E. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re H.E., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D079644 |
| Plaintiff and Respondent, | (Super. Ct. No. J520144) |
| v. | |
| S.E., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

S.E. (Mother) appeals from the juvenile court's order terminating her parental rights to H.E., her then 20-month-old daughter. (Welf. & Inst. Code, § 366.26.)[1] She contends the juvenile court erred in finding the parental-benefit exception to adoption did not apply. (§ 366.26, subd. (c)(1)(B)(i).) Because we conclude Mother has not affirmatively demonstrated error, we affirm the juvenile court's order terminating Mother's parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2019, Mother was arrested after she was found driving under the influence of methamphetamine and cocaine, with then two-month-old H.E. unrestrained on her lap. Earlier, Mother had called 911 to report she was experiencing hallucinations. Witnesses also recounted seeing Mother squeezing H.E.'s neck and holding her tightly to her chest. Mother had an extensive history of mental health issues and substance abuse, and was receiving voluntary services from the San Diego County Child Welfare Services Agency (Agency) the two months prior to her arrest.[2]

The Agency filed a petition under section 300, subdivision (b)(1), alleging that Mother's substance abuse and mental illness rendered her unable to safely care for H.E. At the September 2019 detention hearing, the juvenile court made a prima facie finding on the petition, ordered H.E. detained in out-of-home care, and allowed Mother supervised visits in accordance with the rules of the Las Colinas Detention Facility (Las Colinas)

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] H.E.'s alleged father, D.T., also has a history of substance abuse and mental illness. He refused to participate in the dependency proceedings.

where she was being held in custody.  At that time, Las Colinas limited Mother to video visits with H.E.

At the October 2019 jurisdiction and disposition hearing, the juvenile court found the petition true, removed custody from Mother and ordered reunification services for her.  After Mother's release from jail, police arrested her again in late October 2019 after she threw a rock through the window of a grocery store.  In early December 2019, Mother was released from jail and moved in with the maternal great-grandmother and maternal grandfather. She had supervised visits with H.E. two or three times each week.  A psychological evaluation of Mother resulted in a diagnosis of bipolar 1 disorder, posttraumatic stress disorder, and borderline personality disorder.

In mid-March 2020, the Agency suspended Mother's in-person visits due to COVID-19.  Based on the parties' stipulation, the juvenile court made the six-month review findings and orders without a hearing in early April 2020.  It ordered continued reunification services for Mother including unsupervised visitation and gave the Agency discretion to begin overnight visits.  Socially-distanced visits started in late April 2020 and Mother was granted unsupervised visitation in late May 2020.  Visitation stopped in August 2020 because Mother was  psychiatrically hospitalized for five days. She had a second psychiatric hospitalization in September 2020 and was discharged to an independent living program.

In November 2020, the Agency placed H.E. with the maternal aunt and uncle who have known her since birth.  At the contested 12-month review hearing that same month, the juvenile court terminated Mother's reunification services and set a selection and implementation hearing under section 366.26.  Mother had weekly supervised visitation with H.E. which the social worker described as "positive."  The social worker commented that H.E.

"appear[ed] comfortable in the care of her mother and has no issues transitioning to and from the visits. [H.E.] appeared equally comfortable in the presence of her caregivers and easily went to the caregivers at the end of each visit." H.E.'s caregivers expressed their wish to adopt her.

The contested section 366.26 hearing in May 2021 proceeded as a trial on the documents. Although the social worker was available for cross-examination, Mother had no questions. The Agency conceded that Mother's recent visits have been consistent and "very positive." The Agency stated, however, that the question was whether "this relationship outweigh[ed] the benefits of adoption." Despite the positive visitation with Mother, the Agency noted H.E. was bonded to her caregivers, called them "mama and dada," and ended visits with Mother without becoming upset. In its section 366.26 report, the Agency stated "a parent-child relationship exists" but "it does not rise to the level of outweighing the benefits of adoption." At the hearing, the Agency reiterated its belief that Mother's relationship with H.E. did not outweigh "the benefits of adoption even though it's very clear that mother very much loves her child." After finding H.E. specifically and generally adoptable, the juvenile court found adoption to be in H.E.'s best interest, the parental-benefit exception to adoption did not apply, and terminated Mother's parental rights.

DISCUSSION

I.

*General Legal Principles*

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.) At this hearing "the juvenile court has three options: (1) to terminate parental rights and order

4

adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care. [Citation.]  Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan.  [Citation.]  The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the exceptions to the preference for adoption is the parental-benefit exception.  (§ 366.26, subd. (c)(1)(B)(i).)  For this exception to apply, the parent must show by a preponderance of the evidence:  (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

The first element, visitation, is "straightforward," requiring that the " 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The second element focuses on the child and is determined by taking into consideration factors such as " 'the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)  For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption.  [Citations.]  Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights

5

terminates the relationship." (*Caden C.*, at p. 633.)  When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption.  (*Id.* at p. 634.)

When deciding whether terminating parental rights would be detrimental to the child, the court is not comparing the parent's and custodial caregiver's attributes.  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  Additionally, a parent's lack of progress in addressing the issues that led to dependency is not determinative.  (*Id.* at p. 637.)  Nonetheless, a parent's inability to address the issues leading to dependency can be relevant in assessing whether the interaction between parent and child "has a 'negative effect' on the child."  (*Ibid.*)  Performing this analysis is a "subtle enterprise."  (*Id.* at p. 634.)  "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home."  (*Ibid.*)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)  As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists.  (*Id.* at p. 640.)  "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion."

6

(*Ibid.*)  A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' "[3]  (*Id.* at p. 641.)

## II.

### *The Juvenile Court Did Not Abuse Its Discretion in Terminating Parental Rights*

The juvenile court concluded Mother consistently visited H.E. for the past several months before the section 366.26 hearing.  The Agency does not argue this element, and our review of the record shows that Mother maintained consistent visitation throughout the case to the extent that the juvenile court permitted visitation and Mother's treatment allowed.

On the second element, whether Mother provided H.E. with the type of substantial, positive emotional attachment required for application of the parental-benefit exception to termination of parental rights, Mother argues the juvenile court erred as a matter of law by improperly considering her ongoing personal issues and focusing on her parental relationship with H.E. She contends the juvenile court further erred by failing to engage in a meaningful analysis of H.E.'s bond to her.  She asserts these errors were not harmless and that a remand is required because a reasonable probability existed that the exception would have been found to apply had the juvenile court employed the correct legal analysis and standards as articulated in

---

[3]    The *Caden C.* court explained " 'there likely will be no practical difference in application of these two standards,' " but "[a]t its core, the hybrid standard [it] now endorse[s] simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C., supra,* 11 Cal.5th at p. 641.)

*Caden C.*, *supra*, 11 Cal.5th 614.[4] On this record, we are not persuaded that the juvenile court erred because there is little to no evidence the juvenile court relied on factors deemed improper in *Caden C.*

Before ruling, the juvenile court complimented Mother on her recent progress, her commitment "to moving forward in a healthy way in the future," and her love for H.E. Based on these comments, Mother asserts the juvenile court improperly considered her ongoing personal issues. We disagree. In *Caden C.*, *supra*, 11 Cal.5th 614, our high court rejected the "paradoxical proposition" that the parental-benefit exception "can only apply when the parent *has* made sufficient progress in addressing the problems that led to dependency." (*Id.* at p. 637.) The juvenile court would have erred had it considered Mother's *lack of progress* in addressing her mental health issues as a factor in the application of the parent-benefit exception. The juvenile court did not do that, and we decline to construe the juvenile court's *positive* comments regarding Mother as improper.

Citing *In re B.D.* (2021) 66 Cal.App.5th 1218 and *In re J.D.* (2021) 70 Cal.App.5th 833, Mother contends the juvenile court erred as a matter of law by requiring her to show that she had a parental relationship with H.E. and occupied a parental role during visitation with H.E., as compared with what the juvenile court described as a " 'friendly visitor' " situation.

To address this argument, we first recite the juvenile court's comments. After discussing visitation, the juvenile court concluded that "a parent-child bond sufficient to thwart the general legislative preference for adoption," under existing case law, was not present in this case. The court stated:

---

[4] The trial court here did not have the benefit of *Caden C.* when it rendered its decision. *Caden C.* was issued three days after the section 366.26 hearing in this case.

"As was noted, [H.E.] was removed from Mother's care when she was two months old and since then has had her daily needs met by others. ¶ She's clearly bonded to the current caregivers and [relies] on them for her day-to-day care. She regards [Mother] as what case law describes as 'a friendly visitor.' And so it's simply not the type of relationship that was envisioned when the legislature created an exception under the parent-child bond."

The juvenile court did not make an express finding on the second and third elements of the parental-benefit exception. Rather, it conflated these elements, finding the parent-child bond to be insufficient for application of the parental-benefit exception. From the juvenile court's comments, we infer the implied findings that Mother did not meet her burden of proof on the second and third elements.[5] As we shall discuss, the evidence supports the juvenile court's implied finding that the strength of the bond between Mother and H.E. was insufficient to establish the parental-benefit exception. Additionally, Mother has not shown that the juvenile court abused its discretion in finding the harm of severing the parent-child relationship did not outweigh the security of a new adoptive home.

Although Mother's counsel argued that Mother occupied a parental role, the juvenile court never used the term "parental role." As another court noted, this term is problematic because it may correctly mean that a child has "a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents," or it might erroneously mean that the parents were "not capable of taking custody, or had not been good parents, or

---

[5] "The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.) This doctrine applies in juvenile dependency cases. (See *In re Zacharia D.* (1993) 6 Cal.4th 435, 456.)

9

had not been providing necessary parental care." (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211.) Instead, the juvenile court stated that it examined the "parent-child bond" between Mother and H.E. as this term was used in then-existing case law and found the bond here more like " 'a friendly visitor' " and insufficient "to thwart the general legislative preference for adoption."

The juvenile court was required to assess whether H.E. "would benefit from continuing" her relationship with Mother. (§ 366.26, subd. (c)(1)(B)(i).) At the time of the section 366.26 hearing, existing case law provided that the parent-child relationship required "a significant, positive, emotional attachment from child to parent" such that the severance of that relationship would cause great harm to the child. (*Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575–576.) In making that determination, the court is to consider factors such as "the age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id.* at p. 576.) Although *Caden C*. was decided after the juvenile court's ruling, it affirmed these factors are appropriately considered in evaluating the second element of the parental-benefit exception. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting *Autumn H.*, at p. 576.)

Here, the juvenile court properly considered H.E.'s age when she was removed from Mother's care and the amount of time she spent having her daily needs met by others because "[a] 'significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.' " (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) While the juvenile court did not expressly analyze how H.E. felt about

10

Mother, it considered the Agency reports dated March 3, May 4, and May 24, 2021, which contained information about H.E.'s bond with Mother.

The Agency reported that Mother came to visits prepared with a diaper bag and food, H.E. easily went to Mother, and Mother's interactions with H.E. were positive and involved Mother playing, singing, reading books to H.E., and feeding the child. However, at the end of visits, H.E. easily transitioned to the caregivers. Notably, when the caregivers arrived at the end of one visit, H.E. "ran to them in excitement saying 'dada.'" When the caregivers arrived at the end of another visit, H.E. went to them saying "'mama.'" At the start of another visit, H.E. went with Mother easily but started crying "'mama'" and searched for the caregiver when the caregiver walked away. Mother became frustrated stating, "'[H.E.], I am your mom'" and asked the caregiver to not allow H.E. to call her mom. H.E. transitioned easily into the caregiver's car at end of this visit. In the Agency reports, the social worker consistently acknowledged Mother's positive relationship with H.E. but concluded the relationship did "not outweigh the benefit of adoption." This constitutes substantial evidence supporting the juvenile court's conclusion that while H.E. had a "parent-child relationship" with Mother, her significant emotional attachment was to her caregivers.

Mother contends the juvenile court erred by failing to engage in a meaningful analysis of H.E.'s bond to her. However, she cited no authority to support her argument that a juvenile court is required to make factual findings on any of the three elements of the parental-benefit exception. "Although a statement by the trial court of its findings (or reasons) for its decision is helpful in conducting appellate review, it was not a legal requirement in this instance." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Rather, the *In re A.L.* court inferred "from section 366.26, subdivision

11

(c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental." (*Id.* at p. 1156.)

It is Mother's burden to affirmatively demonstrate error on appeal. (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1161.) We cannot presume the juvenile court erred. To the contrary, we must indulge in every presumption to uphold the judgment. (*Ibid*.) Nothing in the juvenile court's ruling affirmatively shows that it based its decision on grounds later identified in *Caden C.* to be improper. It did not improperly consider Mother's efforts to complete her case plan or address any circumstances that led to dependency in deciding whether the exception applied. (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) Nor did it improperly compare the parenting abilities of Mother with H.E.'s caregivers. (*Id.* at p. 634 [when a juvenile court weighs whether termination would be detrimental it is "not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)"].)

Mother's reliance on *In re B.D.*, *supra*, 66 Cal.App.5th 1218 and *In re J.D.*, *supra*, 70 Cal.App.5th 833 to show error is misplaced. In *In re B.D.*, the juvenile court considered a social worker's report equating a parental role with the ability to parent on a fulltime basis and maintain sobriety. (*Id.* at p. 1229.) The juvenile court then expressly considered whether the parents occupied a " 'parental role' " and whether a " 'parental relationship' " existed. (*Id.* at p. 1230.) Thus, the Court of Appeal in *In re B.D.* found the juvenile court had considered improper factors at the second step of its analysis and reversed the order terminating parental rights. (*Id.* at p. 1231)

In *In re J.D.*, *supra*, 70 Cal.App.5th 833, the Agency's counsel and minor's counsel both alluded to factors now deemed irrelevant in *Caden C.*, such as the fact that the minor viewed the caregiver's home as his home and the mother's visits were still supervised, which suggested that the mother's parenting struggles were a reason to rule against her. (*Id.* at pp. 863–864.) After hearing these arguments, the juvenile court found the mother's relationship with the child "did not 'amount to a parental bond.' " (*Id.* at p. 864.) Thus, the Court of Appeal in *In re J.D.* concluded the juvenile court may have applied the wrong legal standard under *Caden C.* when evaluating the second element of the parental-benefit exception and reversal was required because it was unclear whether and to what extent the juvenile court had considered improper factors. (*Id.* at p. 865.)

Here, unlike *In re B.D.* and *In re J.D.*, the social worker found that Mother and H.E. shared "a parent-child relationship" and "H.E. appears to have a relationship with her mother and enjoys spending time with her." Thus, in its reports, the Agency appears to have conceded that H.E. "would benefit from continuing" her relationship with Mother (§ 366.26, subd. (c)(1)(B)(i)) but found the relationship did not outweigh the benefits of adoption. During the contested hearing, the Agency argued Mother came prepared for visits, and visits were positive, but that this relationship did not outweigh the benefits of adoption.

Even assuming Mother established that she and H.E. shared a substantial, positive emotional attachment as apparently conceded by the Agency, after independently reviewing the entire record, we conclude the juvenile court did not abuse its discretion in impliedly finding that terminating the relationship would not be detrimental to H.E. "when balanced against the countervailing benefit of a new, adoptive home." (*Caden*

*C.*, *supra*, 11 Cal.5th at p. 636.) The Agency removed H.E. from Mother's custody when she was two months old and she spent the next year in foster care. Since she was about 14 months old, H.E. has lived with her caregivers and prospective adoptive parents, the maternal aunt and uncle, who have known H.E. since birth and want to adopt her. H.E. refers to her caregivers as "mama" and "dada" and ended visits with Mother without becoming upset.

Like the Agency and the juvenile court, we have no doubt Mother loves H.E. But she presented no evidence and did not argue at the contested hearing that terminating H.E.'s relationship with her would be detrimental to H.E.; she identified no harm H.E. would suffer from the loss of this relationship; and she offered no theory under which we could conclude that H.E.'s loss of her relationship with Mother would outweigh the benefit of stability to H.E. in a new adoptive home. Nor does her appellate briefing address this issue.

In contrast, the social worker concluded that Mother's relationship with H.E. did not outweigh the benefits of adoption after observing visits between Mother and H.E. over several months. At the contested hearing, the juvenile court incorporated by reference some of the Agency's recommendations, including that no circumstances existed making termination of parental rights detrimental to H.E. Viewing the evidence in the light most favorable to the juvenile court's order (*Caden C.*, *supra*, 11 Cal.5th at p. 640), as we must, we conclude the juvenile court did not abuse its discretion in declining to apply the parental-benefit exception to adoption.

## DISPOSITION

The order terminating parental rights is affirmed.

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.